**FILED**

**MAY 23, 2008**
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

MHN

**RECEIVED**

MAY 6 2008 aew
5-6-2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

### IN THE UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

United States of America ex rel.

__Keith Blood K92762__
(Full name and prison number)
(Include name under which convicted)

PETITIONER

vs.

__Terry McCann__
(Warden, Superintendent, or authorized
person having custody of petitioner)

RESPONDENT, and

(Fill in the following blank **only** if judgment
attacked imposes a sentence to commence
in the future)

ATTORNEY GENERAL OF THE STATE OF

_____
(State where judgment entered)

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**08CV2602**
**JUDGE DARRAH**
**MAG. JUDGE VALDEZ**

Case Number of State Court Conviction:

__01 CF 86__

### PETITION FOR WRIT OF HABEAS CORPUS – PERSON IN STATE CUSTODY

1. Name and location of court where conviction entered: __Will County Circuit__
__Court Joliet Illinois__

2. Date of judgment of conviction: __5/24/2002__

3. Offense(s) of which petitioner was convicted (list all counts with indictment numbers, if known)
__First Degree Murder - Count 1,2,3. Armed Robbery - count 4. Residential burglary -__
__Count 5.__

4. Sentence(s) imposed: __48 yrs and 23yrs, Totaling "71 yrs."__

5. What was your plea? (Check one)   (A) Not guilty   (✓)
                                      (B) Guilty        (  )
                                      (C) Nolo contendere (  )

If you pleaded guilty to one count or indictment and not guilty to another count or indictment, give details:

_____

Revised: 7/20/05

## PART I – TRIAL AND DIRECT REVIEW

1. Kind of trial:  (Check one):     Jury (✓)       Judge only (   )

2. Did you testify at trial?       YES (✓)       NO    (   )

3. Did you appeal from the conviction or the sentence imposed?  YES (✓)  NO (   )

    (A) If you appealed, give the

        (1)   Name of court:   Appellate Court

        (2)   Result:   Affirmed

        (3)   Date of ruling:   July 23, 2004

        (4)   Issues raised:   Where Patrick Scott testified that defendant was arrested because the witness' brother, Christopher Scott, a non-testifying co-defendant, had confessed (continued on extra Page)

    (B) If you did not appeal, explain briefly why not:

4. Did you appeal, or seek leave to appeal, to the highest state court?  YES (✓) NO (   )

    (A) If yes, give the

        (1)   Result:   Denied

        (2)   Date of ruling:   Nov. 24, 2004

        (3)   Issues raised:   1) Patrick's testimony that defendant was arrested because Christopher, a non-testifying co-defendant, had confessed; (Continued on extra Page)

    (B) If no, why not:

5. Did you petition the United States Supreme Court for a writ of *certiorari*?  Yes (   )  No (✓)

    If yes, give (A) date of petition: _____  (B) date *certiorari* was denied: _____

Revised: 7/20/05

Continuation of Part 1 - Trial and Direct Review)
Specifically 3 (A) (4) Issues raised:
Continuation of Issue I:
and testified, defendant was denied a fair
trial.

Issue II
Defendant was denied his right to a fair
trial before the jury where the prosecutor
misstated the evidence, failed to correct false
testimony and cross-examined defendant about
the veracity of state witnesses.

Issue III.
Evidence that defendant refused to answer
officer Guilfoyle's questions about the
details of an alibi defendant had previously
provided denied defendant his right to a fair
trial.

Issue IV
Since the defense theory was the police
influenced Patrick Scott to implicate defendant,
defendant should have been allowed to present
evidence that the day after the homicide the
police, while they were looking for defendant and
a gun, told Kathryn Harris that they really
wanted defendant and offered her financial aid
if she cooperated and helped the police.

Issue V
Keith Bland's consecutive sentences for first
degree murder and armed robbery totaling

71 years were an abuse of discretion failing to recognize defendant's youth and that he was convicted based on accountability, and punishing him for his court room demeanor when his demeanor was the result of defense counsel's advice.

Continuation of Part 1 - Trial and Direct Review Specifically 4 (A) (3)

2.) evidence that defendant exercised his right to stop questioning; 3.) the exclusion of evidence that would have supported the defense theory that Patrick gave false testimony and that the Police had recklessly assisted him in doing so by putting words in his mouth; and 4.) Prosecutorial Misconduct. The appellate court also erred in affirming defendant's sentences because the consecutive sentences totaling 71 years are excessive.

## PART II – COLLATERAL PROCEEDINGS

1. With respect to this conviction or sentence, have you filed a post-conviction petition in state court?

   YES (✓)  NO ( )

   With respect to *each* post-conviction petition give the following information (use additional sheets if necessary):

   A. Name of court: Will County Circuit Court

   B. Date of filing: Dec. 2, 2004

   C. Issues raised: A Will County Sherriff policy that forced Petitioner to wear an electronic stun belt that was approved of by the trial Court (continued on extra Page)

   D. Did you receive an evidentiary hearing on your petition? YES ( )  NO (✓)

   E. What was the court's ruling? Denied

   F. Date of court's ruling: 1 / 11 / 2005

   G. Did you appeal from the ruling on your petition?      YES (✓)  NO ( )

   H. (a)  If yes, (1) what was the result? Affirm

            (2) date of decision: Dec. 8, 2006

      (b)  If no, explain briefly why not: _____

   I. Did you appeal, or seek leave to appeal this decision to the highest state court?

      YES (✓)  NO ( )

      (a)  If yes, (1) what was the result? Denied

            (2) date of decision: May 31, 2007

      (b)  If no, explain briefly why not: _____

Revised: 7/20/05

Continuation of Part 2 - Collateral Proceedings
Specifically 1 (c) Issues raised:
Continuation of Issue 1 :
Violated his constitutional rights to a fair
trial, and due process of law

Issue 2
Appellate Counsel was ineffective for failing
To raise issue of Stun-belt once Violation
Became Apparant.

Issue 3
Trial counsel's failure to object when he
learned that petitioner was being forced
to wear A electronic device throughout
his trial, denied petitioner his constitutional
right to a fair trial.

Issue 4
Trial court abused its discretion by
allowing physical evidence that was connected
to crime but not connected to defendant.
And trial counsel was ineffective where he
failed to object to the admission of such
evidence.

Issue 5

The failure of Trial Counsel to object to the physical evidence admitted at defendant's trial so prejudiced him that only a new trial could cure it.

Issue 6

Appellate Counsel was ineffective for failing to raise the Strickland Violations by trial Counsel to the extent that Appellate Counsel could have done so. And he was also ineffective for failing to challenge the Admission of the physical evidence (Antenna) on Appeal.

Issue 7

Trial court abused his discretion by not granting defense motion to excuse Juror for Cause, do to Juror's admittment that he has a problem understanding Proceedings because he has a problem reading, writeing and understanding the english language.

Issue 8
Trial Counsel failure to preserve
Jury issue by Post-Trial motion
denied Petitioner additional review.

Issue 9
Petitioner was denied equal protection of
the law when members of his race was
Systematically excluded from his jury venire;
In violation of his sixth and fourteenth
amendment to a jury drawn from a
Cross-Section of the community.

Issue 10
Trial Counsel was ineffective for failing to
object to a jury venire that excluded
Blacks.

Issue 11
The state Committed Knowing use of
Perjured testimony when they allowed
their witness to testify falsely that
he was promised no leniency in exchange
for testifying against defendant.

2. With respect to this conviction or sentence, have you filed a petition in a **state court** using any other form of post-conviction procedure, such as *coram nobis* or habeas corpus?    YES (✓)    NO ( )

    A. If yes, give the following information with respect to each proceeding (use separate sheets if necessary):

      1.   Nature of proceeding   Motion for leave to file Successive Post conviction Petition.

      2.   Date petition filed   7/17/2007

      3.   Ruling on the petition   Denied

      4.   Date of ruling   7/19/2007

      5.   If you appealed, what was the ruling on appeal?   I am currently Appealing this Matter in the third District Appellate Court.

      6.   Date of ruling on appeal

      7.   If there was a further appeal, what was the ruling ?

      8.   Date of ruling on appeal

3. With respect to this conviction or sentence, have you filed a previous petition for habeas corpus in **federal court**?    YES ( )    NO (✓)

    A. If yes, give name of court, case title and case number: _____

_____

    B. Did the court rule on your petition?  If so, state

      (1) Ruling: _____

      (2) Date: _____

4. With respect to this conviction or sentence, are there legal proceedings pending in any court, other than this petition?    YES (✓)    NO ( )

If yes, explain: I am currently appealing the denial of a "Motion for leave to file Successive Post-Conviction Petition", in the third district Appellate Court.

Revised: 7/20/05

**PART III – PETITIONER'S CLAIMS**

1. State <u>briefly</u> every ground on which you claim that you are being held unlawfully. Summarize <u>briefly</u> the <u>facts</u> supporting each ground. You may attach additional pages stating additional grounds and supporting facts. If you fail to set forth all grounds in this petition, you may be barred from presenting additional grounds later.

BEFORE PROCEEDING IN THE FEDERAL COURT, YOU MUST ORDINARILY FIRST EXHAUST YOUR STATE COURT REMEDIES WITH RESPECT TO EACH GROUND FOR RELIEF ASSERTED.

(A) Ground one   **WHERE PATRICK SCOTT TESTIFIED THAT DEFENDANT WAS ARRESTED**
Supporting facts (tell your story <u>briefly</u> without citing cases or law):

**BECAUSE THE WITNESS BROTHER, CHRISTOPHER SCOTT, A NON-TESTIFYING CO-DEFENDANT,**

**HAD CONFESSED AND TESTIFIED, DEFENDANT WAS DENIED A FAIR TRIAL.**

The key witness against defendant was Patrick Scott, the brother of Chris-

topher Scott. He testified about various conversations he allegedly heard

between the three co-defendants under the co-conspirator exception to the

hearsay rule (R776, 810). Patrick's testimony indicated that the three men

formed a plan to steal guns from Delores' home, that they visted her home to

learn when family members would not be home, that they returned to her home

and stole various weapons, that Christopher shot Delores, and that they

(SUPPORTING FACTS CONTINUED ON ADDITIONAL ATTACHED PAGES)

(B) Ground two   **EVIDENCE THAT DEFENDANT REFUSED TO ANSWER OFFICER GUILFOYLE'S**
Supporting facts:

**QUESTIONS ABOUT THE DETAILS OF AN ALIBI DEFENDANT HAD PREVIOUSLY PROVIDED**

**DENIED DEFENDANT HIS RIGHT TO A FAIR TRIAL.**

In the instant case, the police interviewed various family members, includ-

ing defendant, shortly after the homicide (R329-31). On September 7th defen-

dant was brought in for an interview (R340). Guilfoyle testified about that

interview as follows:

Q  Did you ask him about if he could provide you any information as to who he

was with on August 31st?

A  Yes, I did.

Q  What was his reaction? (SUPPORTING FACTS CONTINUED ON ADDITIONAL ATTACHED

PAGES)

Revised: 7/20/05

(C) Ground three   **THIS COURT SHOULD ALSO ALLOW THIS PETITION BECAUSE THE**
Supporting facts:

**NUMEROUS INCIDENTS OF PROSECUTORIAL MISCONDUCT DENIED DEFENDANT A FAIR TRIAL.**

In part C of its order, the appellate court addressed and rejected defen-
dant's contention that he was denied a fair trial by the prosecutorial mis-
conduct which occurred during cross examination and closing arguments. The
court found that there was only one instance of misconduct involving the pro-
secutor's comments that introduced her own testimony that there was no trans-
fer of DNA evidence to the drinking glasses which the defendant and his co-
defendants allegedly used because they must have been nervous and had dry
mouths. Since, however, this was a close case where there was no physical

(SUPPORTING FACTS CONTINUED ON ADDITIONAL ATTACHED PAGES)

(D) Ground four   **SINCE THE DEFENSE THEORY WAS THAT THE POLICE INFLUENCED**
Supporting facts:

**PATRICK SCOTT TO IMPLICATE DEFENDANT, DEFENDANT SHOULD HAVE BEEN ALLOWED TO
PRESENT EVIDENCE THAT THE DAY AFTER THE HOMICIDE THE POLICE, WHILE THEY WERE
LOOKING FOR DEFENDANT AND A GUN, TOLD KATHRYN HARRIS THAT THEY REALLY WANTED
DEFENDANT AND OFFERED HER FINANCIAL AID IF SHE COOPERATED AND HELPED THE
POLICE.**

In the instant case the defense theory was not only that Patrick Scott gave
false testimony, but that the police recklessly assisted him by putting words
in Patrick's mouth during the November 8th interrogation. Indeed, the video-

(SUPPORTING FACTS CONTINUED ON ADDITIONAL ATTACHED PAGES)

2.   Have all grounds raised in this petition been presented to the highest court having jurisdiction?

YES (✓)   NO ( )

3.   If you answered "NO" to question (2), state briefly what grounds were not so presented and why not:

_____

_____

_____

Revised: 7/20/05

CONTINUATIONS OF SUPPORTING FACTS

(A) Ground one Supporting facts Continued:
discussed an alibi where Ian was supposed to have been with his wife and
Christopher and defendant where supposed to have been playing basketball
(R771-72,777,782,785-87).

Patrick admitted that he left for Colorado shortly after the killing (R799)
He spoke to the police on November 8, 2000, in Colorado. He came back to
Illinois on January 28, 2001, and spoke to them again. Both times he gave a
videotaped statement (R787,799). Prior to giving a videotaped statement on
the 8th, he talked to Officer Guilfoyle (R816-17). On the 8th, Patrick was not
straightforward with the police. On the 28th, after Christopher, Ian, and
defendant had been arrested, he returned to Illinois on his own and told the
police what he had withheld (R805-06). Patrick also testified as follows
during cross examination:
Q    so when you were talking to them about these conversations that Keith and
Ian and your brother Scott allegedly were talking about and things that they
said they did, you thought that was a joke too?
A    No, I told them--I just half step. I didn't tell'em everything.
Q    You half step?
A    Meaning that I told them what I wanted to tell them. I didn't tell them
everything that I knew.
Q    You understand that these individuals were arrested and charged with
murder based on your half step, half things that you knew.
MS. BOGGS:    Objection. That's not the evidence.
THE COURT:    Overruled. You can answer that.
THE WITNESS:    No, I didn't know that. **I thought that they was arrested
because of Chris's confession.**
BY MR. LENARD:
Q    You gave another statement to the police on the 28th, correct?
A    Right.
Q    And you are saying that that was the other half of what you had to say?
A    Yeah.
Q    Okay. And you knew that they had already been arrested when you gave them
the other half; isn't that correct?
A    Yeah. The reason--
Q    Well if you can just answer my questions.
      So would it be fair to say that the additional information that you gave
them on the 28th did not lead to their arrest for these charges, correct?
A    I don't know. I don't know what lead to the arrest. Like I told you, thats
the only thing I thought led to the arrest.
(R807-08)(emphasis added).
Q    Mr. Scott, why is it that you went back and talked to the police on the
28th, 2001?
A    Well, **the reason I went back and talked to them, from what I was hearing
that my brother already confessed to it.** So I took it upon myself thinking
like, well, damn, I know what happened, you know what I'm saying, by what they
telling me, you know what I'm saying. I'm far from stupid. So **I know by Chris
testifying he already booked and there is a chance of Keith and Ian getting
out.** So by that being my brother, I wasn't going to let it happen. That's the
reason I went there and talked to'em.

Q   Do you recall during that conversation when you talked to the police, you
do recall telling them that you're feeling bad? Do you remember saying any-
thing like that?
A   Yeah.
Q   And what was it that you were feeling bad about?
A   I'm saying I was feeling bad about what happened, because I looked at it
as if it was my grandmother, how I felt about my grandmother. And by me know-
ing that I know what happened, I always have a conscience about it, you know
what I'm saying. So I just called Bradley. I was like BS'ing you all that
I got to tell you all to get it off my chest. And **one of the reasons why I
went up there, same reason about like I told you, When Chris confessed as well**
(R823-24)(emphasis added).

     Outside the jury's presence, defense counsel moved for a mistrial based on
Patrick's references to his brother having confessed. The court, however,
denied the motion (R840-42). Defendant reiterated this issue in the motion for
new trial (C202).

     The trial court erred in failing to grant a mistrial and/or a new trial.
Patrick informed the jury that Christopher, a non-testifying co-defendant, had
confessed to the crime. Moreover, Patrick informed the jury that Christopher
had implicated defendant because defendant was arrested based on Christopher's
confession and testimony and not Patrick's statement that he provided on Nov-
ember 8th. This evidence denied defendant his rights as guaranteed under the
sixth and 14th amendments to the United States Constitution.

     In the instant case, the evidence that Christopher had confessed and impli-
cated defendant was devastating, as defense counsel recognized when arguing
the motion for new trial (R667). The jury had already heard evidence that
defendant allegedly gave the police an alibi, stating that he had been in
Chicago playing basketball with Christopher. Thus once the jury learned that
Christopher had confessed, it must have concluded that defendant was guilty
(R670).

     In sum, Patrick Scott's testimony that defendant was arrested because his
brother, Christopher, had confessed and testified prejudiced defendant and
denied him a fair trial by jury.


(B) Ground two Supporting facts Continued:
A   When I asked him who he was with again revisited the statements from the
first time, he became extremely angry with me.
Q   What did he do?
A   He started saying he can't remember where he was at all, couldn't remem-
ber who he was with at all, and he continued to stick his fingers in his ears
as if not to hear me and start to tell me I am not listening to you and
specifically saying blah-blah-blah-blah-blah, I am not listening to you.
     At that point I couldn't speak with him at all. I couldn't have a conver-
sation so I terminated that interview.
(R341).
     Guilfoyle acknowledged that he asked defendant if he had been involved in
the homicide, he became angry and that it got to the point where defendant
said that he did not remember where he was on the 31st. The interview was
short because defendant stuck his fingers in his ears and was not willing to
listen to the questions(R351-52). After Guilfoyle was finished with defen-
dant, he asked Bradley and Hayes to talk to defendant. However, the conver-
sation was short because "pretty much the same thing happened" (R354).

Guilfoyle's testimony about defendant's conduct and refusal to answer

questions violated due process (U.S. Const. amend. XIV) and denied defendant
a fair trial. Even though defendant was not in custody he had been advised of
his rights under Miranda, Which included the right to stop answering ques-
tions at any time. Consequently, it violated due process for the prosecutor to
elicit evidence that defendant had exercised his right to terminate question-
ing. It was fundamentally unfair to advise defendant of those rights and then
to elicit evidence that he had exercised them. It is evident that defendant
was prejudiced by the evidence that he exercised his right to terminate
questioning. The State's case against defendant rested entirely on Patrick
Scott's testimony. Moreover, there was no physical evidence linking defendant
to the crime.

(C) Ground three Supporting facts Continued:
evidence, the error must have prejudiced defendant.
    With respect to the prosecutor's failing to correct an obvious misstate-
ment by defendant and taking advantage of that misstatement in closing argu-
ment, the appellate court found that there was "no rule of law to support
the defendant's theory that the prosecutor has a duty to correct the [defen-
dant's obvious misstatement]" (Appendix A; order at 11). Defendant urges this
Court to allow this petition and use this case to establish that the pro-
secutor is not at liberty to strike foul blows and cannot take advantage of an
obvious misstatement she knows is false.
    More specifically, during closing argument, defense counsel argued defen-
dant did not need to steal guns because he had one. Defense counsel noted that
defendant had been particularly forthright in his testimony because he ad-
mitted that the gun he had was a .38 (R567-78). A .38 had been taken during
the homicide and Delores was shot with a .38 (R198, 400).
    In rebuttal, the prosecutor commented as follows:
    Ladies and gentlemen, another thing that Mr. Bland told you which I thou-
ght was real interesting, I didn't have any reason to go and get a gun on
that day because I had one. Remember? But he told you also from that stand
in January of the 2000, some eight months before the murder, the police had
taken that gun from him. Did he have a gun that day? Did he have money that
day? Obviously not. Because he was out at that house to get those two things.
(R602).
    Defendant, however, was not arrested in January 2000 but was arrested on
January 4, 2001 (Supplemental Record; See P.S.I. Ex.2--last page). Defendant's
testimony that he thought he had been arrested on January 5, 2000, was an
obvious misstatement that the prosecutor had to have recognized. Indeed, in
rebuttal the prosecutor filed a certified copy of defendant's conviction
which showed that defendant was arrested on the weapon charge on January 4,
2001 (Supplemental Record; R505). In this case, the Cook County indictment,
was filed on January 19, 2001, and the judgment order shows defendant was
sentenced on June 1, 2001, with credit for 147 days, spent in custody which
calculates back to the day defendant was arrested, i.e., January 4, 2001.
Thus it was error for the prosecutor to take advantage of defendant's mis-
statement.

    The prosecutor is a representative of the people, including the defendant,
and is not at liberty to strike foul blows. Moreover, the prosecutor cannot
allow to go uncorrected testimony which she knows to be false. In this case
the prosecutor struck a foul blow when she took advantage of defendant's mis-
statement. This Court should allow this petition to address this instance of
misconduct.

(D) Ground four Supporting facts Continued:
taped statement on the 8th was admitted to show the manner in which the
police had conducted the interview (R843-45).

In an attempt to show bias on the part of the police to recklessly build
a case against defendant, defendant attempted to call Kathryn Harris. Harris'
testimony, however was prevented by the State's preemptive motion to bar her
testimony before the defense even called her to testify (R442-43). In an offer
of proof, defense counsel indicated that Harris was a friend of defendant's
wife and would testify that the day after shooting the two officers came to
Sicill Bland's house looking for defendant and a gun. One asked if defendant
had a gun, said that they really wanted defendant, said he knew Harris was on
Public Aid, and offered her money to take care of her child if she cooperated
(R444). The court allowed the State's motion and ruled Harris could not
testify (R447-48).

In the motion for new trial, defendant argued that the court's ruling had
denied him a fair trial (C202). Kathryn Harris testified at the motion for
new trial and indicated that the day after the homicide officer Bradley and
some other detectives came to her apartment in Chicago. Bradley asked her if
defendant lived there and she replied "no" but added that defendant's wife
lived there (R661). In response to questions, she indicated that she did not
know where defendant lived and that defendant did not have any guns in the
apartment. The officers searched everything in the apartment without per-
mission (R661). When they were done searching, Bradley told her that he knew
she was on Public Aid and that if she helped him "get" defendant he would
give her money because he wanted defendant "real bad" (R662).

Defendant was denied his right to a fair trial by the exclusion of Harris'
testimony. It is a fundamental principle of criminal law that a defendant has
the right to present a defense and place his version of the facts before the
jury, along with the State's, so that the jury may decide where the truth
lies. Adefendant is entitled to all reasonable opportunity to present rele-
vant evidence which might tend to create a doubt as to his guilt. The ex-
clusion of relevant exculpatory evidence infringes on a defendant's constitu-
tional right to present his version of the case to the jury. U.S. Const.
Amends. VI and XIV. Absent a compelling reason, a witness should not be barred
from testifying in support of the defense.

The appellate court erred in finding that this evidence would have been
irrelevant (Appendix A; order at 9). Harris's testimony would have supported
the defense theory that the police recklessly helped frame defendant with the
homicide. Patrick Scott's first videotaped statement was admitted to show the
manner in which the police conducted the interview. Specifically, it was the
defense theory that the police were putting words into Patrick's mouth.
Harris's testimony would have corroborated that theory. Thus, it was error
to exclude it. Consequently, this Court should allow this petition to consider
this issue.

## GROUND FIVE (5)
## AND SUPPORTING FACTS

(E)  Ground five and Supporting facts:

A WILL COUNTY SHERRIFF POLICY THAT FORCED PETITIONER TO WEAR AN ELECTRONIC
STUN-BELT THAT WAS APPROVED OF BY THE TRIAL COURT VIOLATED HIS CONSTITUTIONAL
RIGHT TO A FAIR TRIAL, AND DUE PROCESS OF LAW. FURTHER, THE RELATED CLAIM THAT
COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO ITS USE CONSTITUTES A CONSTI-
TUTIONAL VIOLATION.

In petitioners post-conviction petition, several allegations were made.
Among them were that forcing the petitioner to wear a stun-belt violated his
right to a fair trial, particularly when no reason were pro-offered as to why
he should be forced to wear such a restrictive device. Additionally, the
petitioner averred that his counsel was ineffective for failing to object to
him having to wear the stunbelt. The petition also claims that the stun belt
may have been visible to the jury and it adversly affected his testimony as
he was afraid of being shocked.

Although trial courts have wide discretion in ensuring security in the
courtroom, a criminal defendant should not be placed in restraints unless
there is reason to believe he poses an escape or safety risk, or it is neces-
sary to maintain order in the courtroom. The unnecessary use of restraints
violates the Constitution.

The presumption of innocence is firmly rooted in American Jurisprudence,
a presumption that should not be jeopardized by requiring the accused to
appear at trial burdened by unnecessary trappings suggestive of guilt. The
United States Supreme Court has recognized the risks associated with the use
of visible restraints. First, the sight "might have a significant effect on
the jury's feelings about the defendant." Indeed, the prejudice which inures
when jurors are aware the defendant is wearing a stunbelt may be even greater
than that associated with traditional shackles,'''because it implies that
unique force is necessary to control the defendant.'''

Accordingly, the use of shackles is limited to those instances where there
is a showing of manifest need for such restraints. Courts which have addressed
the related use of stun belts have held that "a decision to use a stun belt
must be subjected to at least the same 'close judicial scrutiny' required for
the imposition of other physical restraints."

In addition to violating the Fourteenth Amendment due process guarantees,
the unnecessary use of restraints violates the Sixth amendment right to confer
with counsel, and, in the case of electric stun belts, the Sixth Amendment
right to testify as well. Given the particular nature of these constitutional
infringements, violations can occur even in those instances where jurors are
not aware that the defendant has been restrained. Courts have recognized that
the use of physical restraints may interfere with a defendant's fundamental
right to be present at trial by hindering his ability to communicate with
counsel, a risk which, in the case of electronic stunbelts, is present even
when jurors are unaware that the defendant is subject to restraint.

The psychological effects from wearing such a device "cannot be under-
stated." The fear of the foregoing consequences not only may hinder a defen-
dant's communication with counsel for fear of making a gesture which might be
perceived as threatening - it may also interfere with the accused's privilege
to testify on his own behalf by affecting his demeanor on the stand.

The record does not rebut the allegations contained in the petition that the petitioner wore a stun belt at trial, and that the belt caused him to be uncomfortable before the jury. No reasonable trial strategy supports trial counsel's failure to object to the use of the stun belt at trial and preserve the issue for direct appeal.

## PART IV – REPRESENTATION

Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:

(A) At preliminary hearing _____

(B) At arraignment and plea _____

(C) At trial George Lenard _____

(D) At sentencing George Lenard _____

(E) On appeal Peter A Carusona - 1100 Columbus Street Ottawa IL. 61350

(F) In any post-conviction proceeding _____

(G) Other (state): Appeal of post-conviction: Patrick M. Carmody
2010 Larkin Avenue
Elgin, IL. 60123

## PART V – FUTURE SENTENCE

Do you have any future sentence to serve following the sentence imposed by this conviction?

YES (  )   NO ( ✓ )

Name and location of the court which imposed the sentence: _____

Date and length of sentence to be served in the future _____

WHEREFORE, petitioner prays that the court grant petitioner all relief to which he may be entitled in this proceeding.

Signed on: April 30, 2008
(Date)

_____
Signature of attorney (if any)

I declare under penalty of perjury that the foregoing is true and correct.

Keith Blanc
(Signature of petitioner)

K92762
(I.D. Number)

P.O. Box 112 , Joliet IL 60434
(Address)

Revised: 7/20/05

The Following is:

1.) Exhibits in support of this Petition.

2.) Motion for Appointment of Counsel.

3.) IN Forma Pauperis Application and Financial Affidavit.

4.) Notice of Filing.

1   catches them.  Ian is going to say this and he is going to

2   say that.

3          THE COURT:  But the statements as to going to the

4   house to find out things comes from the defendant's mouth.

5          MS. BOGGS:  That's correct.

6          THE COURT:  Well show with regards to the

7   conspiracy -- even an aside from that, show at this

8   juncture the Court feels that there is sufficient evidence

9   with the testimony of the individuals that they were there

10  at the house, what they were inquiring about.  Show as to

11  the conspiracy to steal the guns, show the Court is

12  satisfied and will allow it.

13         MR. LENARD:  Judge, just so I'm clear, is it okay

14  for the witness to testify about "they" were saying,

15  "they," "they," "they"?

16         THE COURT:  No, we're going to have to get it

17  down to who said what so that it's clear.

18                         (WHEREUPON THE WITNESS RESUMED THE

19                          STAND AND THE JURY ENTERED THE

20                          COURTROOM.)

21         THE COURT:  The objection is overruled.  You may

22  continue.

23  BY MS. BOGGS:

24     Q     Patrick, when we were talking earlier we were

1    talked about going to his father's house to get some money

2    and guns; is that right?

3        A    Yeah.

4        Q    When did that conversation take place?

5        A    It happened in the room.  When I came back from

6    Denver my brother had everything set up in the room.  So I

7    was playing a video game in the room, so he -- everybody

8    sitting in the room.  There is nothing in the living room,

9    nothing, no bed, no chair, nothing.  Everything is in the

10   room.  So basically I was in the room just as well as they

11   was in the room.  They weren't paying me no mind, I wasn't

12   paying them no mind.

13       Q    So you weren't paying no mind.  What do you mean

14   by that?

15       A    Meaning that they conversation is they

16   conversation.  I heard it, but it's not my business and I'm

17   playing a video game.  That's my business.

18       Q    So when this conversation is going on you're

19   playing a video game, right?

20       A    Yes.

21       Q    So you're not really there as part of the

22   conversation, you are just overhearing it; isn't that

23   correct?

24       A    No.  I am actually like as close as I am right

1   that be in the apartment, don't pay attention to nothing.

2       Q     He was present at the apartment you think?

3       A     Yeah.

4       Q     Do you know the person Lateef?

5       A     Yeah, that's just a best friend.

6       Q     He was there too?

7       A     Mm-hmm.

8       Q     In this conversation, what was being discussed

9   about the problems with Hot Sauce?

10          MR. LENARD:   Judge, I'm going to object.

11          THE COURT:   Sustained.

12  BY MS. BOGGS:

13      Q     Excuse me, don't say anything.

14          Were Keith, Ian and Christopher discussing some

15  problems that they were having?

16          MR. LENARD:   Objection.

17          THE COURT:   Sustained.

18  BY MS. BOGGS:

19      Q     Patrick, could you tell me if Keith was talking

20  about some problems he was having with Hot Sauce?

21      A     Yes.

22      Q     What was he saying about Hot Sauce?

23      A     That they had got into it because he stole some

24  dope from him.

1        Q       And were other people then participating in the

2   conversation, making suggestions on what they should do?

3        A       Yes.

4                MR. LENARD:  Objection.

5                THE COURT:  Overruled.

6   BY MS. BOGGS:

7        Q       What was suggested that they should do?

8        A       To steal some guns and get some money.

9        Q       Did anybody have a suggestion how they could get

10  some guns?

11       A       Yeah.

12       Q       Who?

13       A       Keith.

14       Q       What did Keith say?

15       A       He said that he knew where to get some guns

16  from.

17       Q       Where did he say to get the guns from?

18       A       From his dad's house.

19       Q       Do you remember at that time if he mentioned

20  what kinds of guns his dad had?

21       A       At that time he didn't mention it.

22       Q       Okay.  But he mentioned going to his dad's

23  house?

24       A       Right.

1    talking Keith had suggested how they could obtain guns.

2    Let's go on forward in that conversation.  Did Ian and

3    Keith then start talking together about what they would do

4    to get those guns?

5         A    Yes.

6         Q    Okay.  What did Keith or Ian suggest that they

7    should do as to how to get the guns?

8         A    They said they would go out there.

9              MR. LENARD:  Objection.

10             THE COURT:  Sustained.

11   BY MS. BOGGS:

12        Q    Do you remember who specifically said that they

13   would go out there?

14        A    Both.

15        Q    What do you mean?

16        A    Keith and Ian.

17        Q    What did they say they were going to do?

18        A    Keith and Ian said that they was going to go out

19   there, talk to Keith's brother and see what -- like what

20   type of schedule that they working out, so a good time that

21   they could take the guns.

22        Q    Did anybody else agree to go with 'em during

23   this event?

24        A    Yes, my brother Chris did.

1       Q    Who was present for the conversation -- who

2   participated in the conversation where they said they were

3   going to go back and get guns?

4       A    Keith, Ian and Chris and me.

5       Q    Okay.  During that conversation did Ian make a

6   statement about what might happen if somebody was there?

7       A    Yeah, he said that, "We was going to go up

8   there, take the guns, if there is any problem then we would

9   have to kill the mother fuckers.  That's just what we're

10  going to do do."

11      Q    What did Keith say about that?

12      A    He says that ain't -- cool, I ain't tripping.

13      Q    I ain't what?

14      A    It really doesn't matter.

15      Q    What did you say first?

16      A    He really not tripping, like it doesn't matter,

17  basically what it means.

18      Q    So it was no big deal to him?

19      A    Right.

20      Q    Now let's go forward then to a couple of days

21  later.  Did you have occasion to be at that residence on

22  King Drive again when they were talking about having got

23  the guns?

24      A    Yes.

1      Q      What was that conversation?

2      A      Well, um, Chris had got into it with some

3   females or whatever, and I guess he got -- I don't know if

4   it is like trigger happy or whatever, he was saying, "I got

5   guns, I got guns."  And it got back to Keith and Ian, so

6   she came over there to talk to him.

7      Q      When they were talking to him, what were they

8   saying to him about being out at Crete?

9            MR. LENARD:  Judge, I'm going to object.  Who is

10   they?

11            THE COURT:  Sustained.

12   BY MS. BOGGS:

13      Q      Again, who was it that was focusing this

14   conversation toward Christopher?

15      A      Keith and Ian.

16      Q      Okay.  What he were they saying to him about

17   being out at Crete?

18      A      It was like a little joking type thing.  They

19   was like, "You man, you wow, like you crazy as hell, man."

20   That's what they said.

21      Q      Did Christopher say anything back?

22      A      He was like, "I had to pop her ass."

23      Q      Okay.  Did he say anything else to them besides

24   he had to pop her?

1      A      He was like, "But fuck that, you know what I'm

2    saying.  If I go down, we all going down, because I ain't

3    going down by myself."

4      Q      Did he then tell them something else, if you

5    recall?

6      A      I can't recall it like that.

7      Q      Did they also talk about alibi?

8      A      Yeah.

9      Q      Okay.  Who specifically was talking about the

10   alibi?

11     A      All three -- Keith, Ian and Chris.

12     Q      And what was it that -- what was the alibi they

13   were to take down?

14     A      That they went up there the first day and they

15   didn't double back and that Keith and Chris supposedly went

16   to play basketball and Ian went somewhere with his wife.

17     Q      Did they talk at all about whether or not they

18   had talked to the police at all?

19     A      Yeah, they told Chris that they had already

20   talked to the detectives already, so everything was cool.

21     Q      And they were to say who was doing what?  What

22   was Ian supposed to be doing that day?

23     A      Ian supposed to have been with his wife, and

24   Keith supposed to have been at the basketball court with

1    Chris.

2        Q    Now you've talked to the police two separate

3    times in this case, correct?

4        A    Yeah.

5        Q    One time in Colorado?

6        A    Yes.

7        Q    The other time where did you talk to them?

8        A    At the station out here in Joliet.

9        Q    And were you actually living in Colorado at the

10   time though?

11       A    Yeah.

12       Q    Did they agree to pay for your transportation

13   back and forth to Colorado if you were to come to them and

14   talk to them here?

15       A    Yes.

16       Q    Other than that, the police assisted you with

17   any other assistance, monetary or otherwise to participate

18   or help us out in this case?

19       A    No.

20       Q    Now, you are here testifying in matters

21   concerning your family, correct?

22       A    Yes.

23       Q    Is that an easy or difficult thing to be doing?

24       A    Well, it's difficult.  I came to tell the truth,

000787

1        THE COURT:  Mr. Lenard, your witness.

2        MR. LENARD:  Thank you, Judge.

3  BY MR. LENARD:

4        Q    Mr. Scott, you testified that you talked to the

5  police about this case on two occasions; is that correct?

6        A    Yes.

7        Q    You didn't talk to them any more times other

8  than those two times, correct?

9        A    No.

10       Q    That would have been on January 28th of 2001 and

11  November 8th of 2000, correct?

12       A    Correct.

13       Q    That's when you gave the two videotaped

14  statements; is that correct?

15       A    Correct.

16       Q    Actually, you had to be arrested and brought to

17  court to testify; isn't that correct?

18       A    Yeah.

19       Q    Okay.  How was it that you got from Colorado to

20  Illinois?

21       A    The detectives came to my house Friday and I

22  wasn't there.  Then Monday they came and got me.

23       Q    Which detectives?

24       A    It was the detectives from Aurora, Colorado.

1    November 8th, 2000, that they were doing most of the

2    talking?  Guilfoyle?

3              MS. BOGGS:  Objection.  If we can have which

4    interview.

5              THE COURT:  November 8th.

6              MS. BOGGS:  Objection.  Foundation as to which

7    interview on November 8th.

8              MR. LENARD:  I thought they only had one on

9    November 8th.

10             MS. BOGGS:  Judge, if we can approach.

11                       (WHEREUPON A CONVERSATION OCCURRED

12                        OFF THE RECORD.)

13   BY MR. LENARD:

14        Q    Mr. Scott, you spoke to the police on November

15   8th, right?

16        A    Yeah.

17        Q    2000?

18        A    Yeah.

19        Q    And you gave a video taped statement; isn't that

20   correct?

21        A    Correct.

22        Q    All right.  You also talked to the police before

23   they started running the video recorder, right?

24        A    Right.

1    Q    As far as you know those statements were not

2    recorded, correct?

3    A    Correct.

4    Q    Okay.  When you gave this videotaped statement,

5    would it be fair to say this is after you had talked to

6    them off the tape?  Would it be fair to say that they were

7    doing most of the talking?

8    A    I can't answer that, because I don't know.  It's

9    like, you know what I'm saying, they ask me -- they asked

10   me a question, I gave 'em an answer.

11   Q    Okay.  And did you feel like they were putting

12   words in your mouth?

13   A    No.

14   Q    Not at all?

15   A    (Witness shakes head.)

16   Q    Is that a no?

17   A    No.

18   Q    Do you recall talking to the police on videotape

19   on November 8th, 2000, and do you recall them -- Michael

20   Guilfoyle asking you this question?

21        "Q    Okay, what was the reason for having to kill

22   Delores Bland?"

23        Do you remember them asking you that question?

24   A    Yeah.

1    come back and talk to them, you came back on your own;

2    isn't that right?

3        A     Correct.

4        Q     And during that second interview isn't it true

5    that you told 'em that you really weren't straightforward

6    with them when you talked to them on November 8th?

7        A     Correct.

8        Q     You told 'em some different things on the 28th

9    compared to what you told them on November 8th; isn't that

10   right?

11       A     Told 'em something different?

12       Q     Yes?

13       A     No, I didn't tell 'em any different, I just told

14   them something more.

15       Q     So you added to it?

16       A     Yeah, I was withholding something basically.

17       Q     You were withholding something?

18       A     Right.

19       Q     Okay.  So you weren't telling them everything

20   when you talked to them on November 8th?

21       A     Nope.

22       Q     You understand that when you came back after --

23   in January, on January 28th and talked to the police, you

24   understand that Christopher, Keith and Ian were arrested?

000805

1        A        Right.

2        Q        And they were in custody; isn't that correct?

3        A        Right.

4        Q        And after they were arrested and in custody,

5   that's when you decided to tell the police some more

6   things?

7        A        Right.

8        Q        Okay.  I'm going to ask you about that

9   conversation on November 8th.  Do you recall having a

10   conversation with Investigator Guilfoyle from the Sheriff's

11   Department and Sergeant Bradley?

12        A        Yeah.

13        Q        And you had a conversation with them that was

14   videotaped; isn't that correct?

15        A        Mm-hmm.

16        Q        Did you feel that when you talked to them on

17   November 8th that they were treating you like a suspect

18   before you gave that videotaped statement?

19        A        They were basically was just like an

20   interrogation.  I didn't feel scared or nothing like that.

21   It was just -- I took it for a joke basically.  That's how

22   I took it.

23        Q        You took it for a joke?

24        A        Right.

1      Q     When you were talking to 'em on November 8th did
2   you take it as a joke also?
3      A     That's the same day you were talking about,
4   right?
5      Q     Yes?
6      A     Yeah.
7      Q     So when you were talking to them about these
8   conversations that Keith and Ian and your brother Scott
9   allegedly were talking about and things that they said they
10   did, you thought that was a joke too?
11      A     No, I told them -- I just half step.  I didn't
12   tell 'em everything.
13      Q     You half step?
14      A     Meaning that I told them what I wanted to tell
15   them.  I didn't tell them everything that I knew.
16      Q     You understand that these individuals were
17   arrested and charged with murder based on your half step,
18   half things that you knew?
19             MS. BOGGS:  Objection.  That's not the evidence.
20             THE COURT:  Overruled.  You can answer that.
21             THE WITNESS:  No, I didn't know that.  I thought
22   that they was arrested because of Chris's confession.
23   BY MR. LENARD:
24      Q     You gave another statement to the police on the

1    28th, correct?

2        A    Right.

3        Q    And you are saying that that was the other half

4    of what you had to say?

5        A    Yeah.

6        Q    Okay.  And you knew that they had already been

7    arrested when you gave them the other half; isn't that

8    correct?

9        A    Yeah.  The reason --

10       Q    Well if you can just answer my questions.

11           So would it be fair to say that the additional

12   information that you gave them on the 28th did not lead to

13   their arrest for these charges, correct?

14       A    I don't know.  I don't know what led to the

15   arrest.  Like I told you, that's the only thing I thought

16   led to the arrest.

17       Q    All right.  All right.  When you spoke to the

18   police on November 8th, you say that you were in a room

19   with three other individuals; is that your testimony?

20       A    We was in an apartment.  An apartment, room,

21   it's the same thing basically, yeah.

22       Q    Do you recall telling the police on that date

23   when the videotape was running, do you remember telling

24   them that you had a conversation -- - they had a

1   your answer was, "Yeah, that's what I said."

2       A       Yeah, that's what I said, but I didn't give no

3   specific date, you know what I'm saying?  You could be in

4   the house by yourself and any questions that he asked me

5   about them concerning them, they was there and impressing.

6   That's only how I knew, you know.

7       Q       You said, "I include them three in the picture,

8   but what I'm saying, Chris, Keith, Ian, me and Patrick."

9   Do you remember saying that?

10      A       No.  I'm just saying -- I'm living in the house

11  right there while I'm there, so of course I'm going to be

12  around them.  That doesn't mean I have to be a part of

13  them.

14      Q       Mr. Scott, why is it that you went back and

15  talked to the police on the 28th, 2001?

16      A       Well, the reason I went back and talked to them,

17  from what I was hearing that my brother already confessed

18  to it.  So I took it upon myself thinking like, well damn,

19  I know what happened, you know what I'm saying, by what

20  they telling me, you know what I'm saying.  I'm far from

21  stupid.  So I know by Chris testifying he already booked,

22  and there is a chance of Keith and Ian getting out.  So by

23  that being my brother, I wasn't going to let it happen.

24  That's the reason I went there and talked to 'em.

000823

1    Q    Do you recall during that conversation when you

2    talked to the police, do you recall telling them about --

3    this is on January 28th.  Do you recall telling them that

4    you're feeling bad?  Do you remember saying anything like

5    that?

6    A    Yeah.

7    Q    And what was it that you were feeling bad about?

8    A    I'm saying I was feeling bad about what

9    happened, because I looked at it as if it was my

10   grandmother, how I felt about my grandmother.  And by me

11   knowing that I know what happened, I always have a

12   conscience about it, you know what I'm saying.  So I just

13   called Bradley.  I was like BS'ing you all that I got to

14   tell you all to get it off my chest.  And one the reasons

15   why I went up there, same reason about like I told you,

16   when Chris confessed as well.

17   Q    Did you tell the police that Ian's wife was

18   contacting you or your family?

19   A    I said that's from what I heard, you know what

20   I'm saying.  Ain't nothing guaranteed.  I said I felt that

21   she was contacting my family to try to tell everybody that

22   their alibi that they was all at the church, you know what

23   I'm saying.  That's all I heard.

24   Q    Mr. Scott, do you recall on January 28th, 2001,

1          THE COURT:   The second one?

2          MR. LENARD:   Right.

3          MR. CONNOR:   If the allegation is that they put

4   words into his mouth during the first tape --

5          THE COURT:   When he came forward the second time

6   they would have the opportunity.   That's legitimate.   There

7   is two tapes that are there are how the interview was

8   conducted, how the first one was conducted, how the second

9   one was conducted there.   I'm going to forewarn everybody,

10  if they sit there and they ask me for that tape when they

11  get back there to the jury room, we're going to have a

12  problem.   Because it's not for the contents, it's merely

13  how the questions are being asked.   Because you raised that

14  issue.   You got that out here as to whether or not he was

15  supplying the information or whether or not the officer was

16  supplying the information during that particular --

17         MR. LENARD:   Well it's possible they might want

18  that tape too to see what the leading nature of the

19  officers questions were.

20         THE COURT:   If they do, we'll zero in on what

21  they want and we'll address it specifically at that

22  particular juncture.

23         MR. LENARD:   There is one other problem.   During

24  the testimony of Patrick Scott he said on at least two

1    occasions about Christopher Scott's confession.   Based on

2    that, I think I have to make a motion, and I will make a

3    motion for a mistrial, because that causes a great problem

4    because I cannot cross-examine Mr. Scott.   There's been

5    testimony that Mr. Bland was with Mr. Scott at the time of

6    the shooting.   And now that the jury has heard that Mr.

7    Scott has confessed to this crime, I think now that they

8    can't get that out of their mind and it's fatal to the

9    Defense's case.

10             MS. BOGGS:   Judge, here's the problem I see with

11   that argument.   This witness is here to give statements

12   about how they did admit to this crime.   Counsel then asks

13   the questions that bring it out about isn't it true, you

14   know, you did this, and why did you come forward at this

15   point.   But he doesn't stop there.   He kept going.   He let

16   this guy say it two or three more times.

17             THE COURT:   Twice.

18             MS. BOGGS:   That's what I think the problem is.

19   So therefore, I believe it is not an appropriate situation

20   for a mistrial.   We all are here over the fact that these

21   people are making statements to these people and, you know,

22   he didn't clarify what the confession was.

23             THE COURT:   He got it.   He asked the question,

24   and the response that was there was in a direct response to

1    that.   It's not like he tried to blurt it out at some point

2    where he asked if it was a Friday and he said anything like

3    that.   It's a direct response to a question.   No contents

4    of Mr. Scott's confession was ever elicited that's out.

5    The only thing is as it appears right now to the jury is

6    that this witness came forward after Mr. Scott testified

7    because he didn't -- since his brother confessed, he didn't

8    want anybody else to skate on the charge.   That's the only

9    appearance that's out before the Court at this particular

10   time.

11            MR. LENARD:   So my motion --

12            THE COURT:   At this time the motion for a

13   mistrial is denied.

14            MS. BOGGS:   I will advise the Court I have no

15   intention to try to bring it out again on redirect.

16            THE COURT:   Or final argument.

17            MS. BOGGS:   Or any other time.

18            THE COURT:   I'm just curious.   All right.   If

19   you want -- I will admonish them now he can't bring up the

20   fact that his brother testified or his brother confessed or

21   made statements.   But they were in direct response to a

22   question that was there, as to why he came forward and so

23   on and so forth.

24            MS. BOGGS:   I guess we're back to my question:

000842

12.     That the prosecutors made prejudicial, inflammatory and erroneous statements in closing argument designed to arouse the prejudice and passions of the jury and to thereby prejudice the Defendant's right to a fair trial.

13.     The Court erred in giving the following instructions over Defendant's objections:

a.     I.P.I. Criminal Instruction, Fourth Edition, No. 5.01A, definition of intent.

b.     I.P.I. Criminal Instruction, Fourth Edition, No. 5.01B, definition of knowledge.

14.     As a matter of law there is reasonable doubt as to the Defendant's guilt.

15.     The Court erred in failing to declare a mistrial, when State witness, Patrick Scott testified on cross that co-defendant Christopher Scott confessed.

16. That the Court erred when it refused to allow defense witness, Katherine Harris, to testify regarding the offer of money from Detective Bradley in return for information about Mr. Bland, and other statements he made.

17.     That the Court erred when it allowed co-defendant hearsay statements to be heard by the jury and considered as evidence.

18.     That all the allegations made in this motion are made without the benefit of the written transcript of the trial, and that the Defendant, Keith Bland, does not limit his motion to the grounds stated nor does he waive any point of error directly or indirectly by implication, but includes in his motion any and all errors committed at trial which will entitle him to relief, and includes those errors not brought to the attention of the Court during trial, whether because of inadvertence or oversight of counsel, or because objections would have highlighted prejudice otherwise.

19.     That all the allegations made in this motion are made without the benefit of the written transcript and that the Defendant, Keith Bland, does not abandon any objections made during trial by failing to include the same in the motion.

1          Judge, if you recall the testimony of

2    Patrick Scott, Patrick Scott testified for the State.

3    And Patrick Scott said on three separate occasions,

4    mentioned the fact that Christopher Scott, the

5    co-defendant in this case, had confessed to these

6    crimes.  Once Christopher Scott's confession became

7    known to the jury, it's my position that after that

8    the case was over.  The whole equilibrium of our case

9    just -- it was a disaster.  It was a disaster.  I have

10   attached the transcript.

11          I know it's probably the State's

12   position, and possibly the Court's position, that any

13   mention of Christopher Scott's confession was based on

14   me asking the question, me opening the door.

15   Basically I got what I asked for.  The reason why we

16   have Motions for a New Trial is so the Court could

17   review what happened in the trial.  And if, in fact,

18   the Court feels that the individual who was convicted

19   of a crime did not receive a fair trial the Court can

20   step in and grant a Motion for a New Trial before the

21   individual is actually punished, and in this case sent

22   to prison for a very long period of time.

23          There is no doubt Mr. Bland, if we get

24   that far, is going to be sentenced to a large period

1          So what I did is I tried to ignor it

2     and I asked another question.  Now, this, you will

3     see, the fact that Patrick Scott testified that

4     Christopher Scott confessed totally changes the case,

5     and it turned our case into a whole total disaster,

6     and everything went downhill from there and it was

7     nothing but damage control.  That's what the exercise

8     of the First Degree Murder case was for us after the

9     jury heard that Christopher Scott had confessed, it

10    was damage control.

11         Because why is that so prejudicial to

12    Mr. Bland's case?  The reason is the State had put on

13    a statement, and I believe they put the statement on

14    before Patrick Scott testified, or maybe they put Mr.

15    Bland's statement on after he testified, but what Mr.

16    Bland's statement to the police was was that he was

17    not guilty of this crime, and in fact he was with

18    Christopher Scott when the crime occurred.  He was

19    playing basketball with him up in Chicago at some

20    park.  Well, the jury has heard that Christopher Scott

21    confessed.  So simple logic tells you that if

22    Christopher Scott confessed, then therefore Keith

23    Bland is guilty because he said himself he was with

24    Christopher Scott.  So that's what the jury heard.

1    spoke to our evidence technicians, the crime scene teams.

2        Q    You talked to family members first?

3        A    Yes.

4        Q    Approximately what time of night was this when

5    you were talking to family members?

6        A    I would have to look at the reports to refresh

7    exactly what time it was they were at the Crete

8    substation.

9        Q    Could it have been very late in the evening?

10       A    Yes, it was quite late into the evening.

11       Q    If you recall, what family members were brought

12   to the police station that night?  If you know.

13       A    Kory.  Kenneth was there.  Keith, Sr. was at the

14   station.  And then other family members started arriving

15   kind of as a point where all the family could get together

16   other than the house because at that time it was a crime

17   scene.

18       Q    What was the emotional and/or physical condition

19   of the three people you mentioned, Kenneth, Keith, Sr. and

20   Kory?

21       A    I interviewed Kory.  He was really taken aback on

22   what he had just seen being the first one home and

23   observing his mother.  It was hard for him to speak of

24   anything at that point because, as he said, his mind was

1    on what he had just seen.

2        Keith, Sr. was -- it was a very short interview

3    with Investigator Barry because of his emotional distress

4    at the time.

5        Q    And now were you present for Kenneth's interview?

6        A    No, I wasn't.  I had gone into Kenneth's

7    interview just to see if they needed any assistance on

8    that, and I stepped out.

9        Q    Basically were the interviews with the family

10   members that evening fairly short?

11       A    Yes, they were.

12       Q    What kind of basic information were you trying to

13   get from them?

14       A    We were trying to learn if there was anything

15   going on in Delores' life, if there was anybody at that

16   time, was there anything that they could relate to us what

17   could have happened, what could have brought us to that

18   point that we were sitting there at that substation.  Was

19   there anything in her life out of the ordinary that had

20   happened?

21       Q    You were looking for leads, correct?

22       A    Absolutely.

23       Q    Were you also still considering those three

24   people that were in front of you?

000330

8

1        A     Yes.

2        Q     Aside from those three folks, were you also

3     interested in talking to other family members?

4        A     Yes, we were.

5        Q     On September 1st, later that same day, did you

6     have occasion to talk to another family member, Keith

7     Bland, Jr.?

8        A     Yes.

9        Q     Do you recall approximately what time that

10    interview took place?

11       A     Between 11:00 o'clock and 11:30 p.m., I believe.

12    In the 11:00 o'clock hour, p.m.

13       Q     Do you recall where that interview took place?

14       A     At our investigative offices in Joliet, 20 West

15    Washington Street.

16       Q     When you brought Keith, Jr. in -- for the record,

17    please, is he in the courtroom here today?

18       A     Yes, he is.

19       Q     Can you identify him and describe something he is

20    wearing, please?

21       A     He is wearing a white shirt, black and white tie.

22       MS. BOGGS:  May the record please note the

23    identification of the defendant?

24       THE COURT:  Record may so show.

00C331

1    approximately six days later, did you have occasion to

2    speak to Keith again on September 7th?

3    A    Yes, I did.

4    Q    Where did that conversation take place?

5    A    Again at our investigative offices at 20 West

6    Washington.

7    Q    And again what was the basis of that conversation

8    with him?

9    A    We revisited another interview with Keith trying

10    to again find out his whereabouts for August 31st.  He

11    would give us some initial statements as the rest of the

12    family did.  And, as we said, we brought all the other

13    family members in our offices for follow-up interviews so

14    this was another follow-up interview with Keith.  And the

15    first interview was the day after this happened to his

16    stepmother.

17    Sometimes within a week somebody will remember,

18    okay, I was with a certain person or at a certain place

19    and we're able to get that information and verify it.  So

20    again we were trying to get more information from Keith.

21    Maybe he remembered somebody he had seen at the park or in

22    the neighborhood that we could talk to.

23    Q    Again you brought him in and you wanted to see if

24    he had remembered something?

95

000340

1     A    Yes.

2     Q    Did you ask him about if he could provide you any

3  information as to who he was with on August 31st?

4     A    Yes, I did.

5     Q    What was his reaction?

6     A    When I asked him who he was with and again

7  revisited the statements from the first time, he became

8  extremely angry with me.

9     Q    What did he do?

10    A    He started saying he can't remember where he was

11  at all, couldn't remember who he was with at all, and he

12  continued to stick his fingers in his ears as if not to

13  hear me and start to tell me I am not listening to you and

14  specifically saying blah-blah-blah-blah-blah, I am not

15  listening to you.

16       At that point I couldn't speak with him at all.

17  I couldn't have a conversation so I terminated that

18  interview.

19    Q    In this case did you conduct some interviews that

20  people agreed to put on videotape?

21    A    Yes, we did.

22    Q    Could you tell us procedurally how it is you go

23  about interviewing people and then putting them on the

24  videotape?

1    well, his wife's residence, correct?

2         A    Yes, in Chicago, yes.

3         Q    And then six days later you wanted to talk to him

4    again?

5         A    Yes.

6         Q    And you spoke to him again on the 7th?

7         A    Yes, we did.

8         Q    Okay.  And when you spoke to him on the 7th, he

9    again continued to deny any involvement, correct?

10        A    It was a very short interview.  I wouldn't say

11   continued to deny.  He just didn't want to speak about it

12   anymore.

13        Q    In fact, isn't it fair to say that you were at

14   some point in time accusing him of this murder?

15        A    Not on that day.  At first I asked him again for

16   his whereabouts on August 31st.  When he was not able to

17   provide where he was and he began to stick his fingers in

18   his ears and it didn't leave much time for us to accuse

19   him at all.  We did ask him if he was involved in this,

20   yes.

21        Q    He said he wasn't?

22        A    Yes, correct.

23        Q    And he became angry, correct?

24        A    Yes.

000351

1    Q    On the 7th?

2    A    Yes, he did.

3    Q    And it got to the point where he says I don't

4    even remember where I was on the 31st; isn't that correct?

5    A    That is correct.

6    Q    And it got to the point where -- strike that.

7         Are you saying that you never did accuse him of

8    this crime as part of an investigative technique,

9    interrogation technique?

10   A    Again, as I said, we did accuse him.  We did ask

11   him if he had done this.  As far an accusatory or

12   interrogation where it would be a lengthy interrogation,

13   no.  You can't speak with somebody that is not willing to

14   listen.  He was not willing to listen to any communication

15   back and forth at all.

16   Q    And you have been trained in investigative

17   techniques, correct?

18   A    Yes.

19   Q    You know how to interrogate people, correct?

20   A    Yes.

21   Q    Have you taken that course by Reed, you know,

22   Seven Steps or Twelve Steps to Interrogation?

23   A    Yes, sir.

24   Q    Okay.  So you know there is different steps?  One

000352

13

1    remember asking him to do that so no, sir.

2        Q    He didn't give you an alibi on the 7th, correct?

3        A    Right.  He stated that he couldn't remember what

4    he was doing.

5        Q    And then when you were done talking to him on the

6    7th, you left the room and Investigator Hayes and Bradley

7    entered the room to talk to him, correct?

8        A    That's correct.

9        Q    Do you know if Investigator Hayes and Sergeant

10   Bradley talked to him after you got done talking to him?

11       A    Yes, they talked to him for a short period.  And

12   the reason I asked them to go in there was because of how

13   he reacted towards my questions.  I figured maybe somebody

14   new going in there, maybe we just didn't have something

15   together that he wasn't going to be talking to me, so

16   Investigator Hayes and Bradley entered the room.  But it

17   was a short conversation, also, because pretty much the

18   same happened with them.

19       Q    So you felt that you weren't getting anywhere and

20   you figured that you would try a different interrogation

21   technique, and that is bring another person in?

22       A    No, sir.  What I wanted to do is just get

23   somebody, if they could have him calm down and again go

24   over where he was on August 31st and see if we can get

000354

1          And you did find out a little bit about Keith

2     Bland.  You saw a little bit about him because, you know,

3     he is not Mr. Personality.  There is no doubt about that.

4     And he is probably not the smartest guy out there either,

5     okay.  But he has a different lifestyle, a different past,

6     than maybe we do.  But he got up there, ladies and

7     gentlemen, and I would submit to you that he was telling

8     the truth, because he got up there and he said that on the

9     31st he was selling drugs.  He didn't have to say that.

10    You know, if he is going to lie he can say that, hey, I

11    was doing a roofing job with somebody in Chicago or I was

12    doing a side job or I was doing something.  But he says I

13    was out selling drugs.  I said, you know that is a crime,

14    right?  Right.

15          So I don't know.  Is it something where you think

16    it's unrealistic for somebody not to want to tell the

17    police they're dealing drugs on the 31st?  You know,

18    it's -- they might not want to be truthful about that.

19          What else did he tell you?  Well, you heard that

20    he has had a gun.  He has had a gun before the 31st

21    because the State's theory is they need guns and money or

22    whatever for either protection or who knows what.  Giving

23    the money back to Hot Sauce or something, I don't know.

24    But he says that he had a gun.  And you can -- you know,

000567

1   the State is going to argue that he can be lying about

2   that.

3          Well, you know also, ladies and gentlemen, he

4   said that he had a .38.  And a .38 -- I think he said

5   Smith and Wesson.  A .38 was actually taken out of the

6   house, okay.  So if he wanted to lie he is not going to

7   say I had a .38.  He could say something like I had a .357

8   Magnum or something or another.  But, no, he said I had a

9   .38.  As you know from common sense, there is a lot of

10  .38s out there, lots of .38s.

11         But he got up there and he says, I was dealing

12  drugs.  He says that, you know, I have been convicted of a

13  crime.  I had a .38.  He got up there and told the truth.

14  And you have the chance to judge his credibility just like

15  the other witnesses do -- or you do with the other

16  witnesses.

17         You are here, ladies and gentlemen, to determine

18  whether or not the prosecution has proved their case

19  beyond a reasonable doubt.  That is your job.  You are

20  here not to appease anybody.  You are not here to help out

21  the State and fill in the gaps.  You are not here to help

22  me out.  You are not here to help anybody out.  And I can

23  assure all of you as you sit here, you feel really bad

24  about what happened to the Bland family.  There is no

000568

1    doubt about that.  But that is not your purpose here.  You

2    are not here today to compensate them.

3        This is a criminal trial where criminal

4    allegations have been brought, and the prosecution's job

5    is to come here and give you evidence.  And you go back to

6    the jury room, and you take this evidence and you put it

7    on your table and you look at just that, just that that

8    they have given you, and you don't speculate.  You don't

9    say, well, this is probably the way it is.  All you look

10   at is what they gave you, and you make a determination as

11   to whether or not that is proof beyond a reasonable doubt.

12       You are not here to judge if he is a good person,

13   if he is a moral person, if he is a nice guy.  You're not

14   here to judge any of that.  He is not on trial for things

15   that he has done in the past.  He is not on trial because

16   he might not have the best personality.  He is not on

17   trial for dealing drugs.  You know, that's why -- you are

18   not here to say, okay, well, let's make a decision.  Do we

19   like him or not?  Of course you don't like him.  Nobody

20   likes people that deal drugs.  You don't like him, but

21   that's not your job to determine whether or not you like

22   him or don't like him.

23       Your job is to determine whether or not they have

24   proved their case beyond a reasonable doubt.  You know, it

000569

1    takes a lot of courage to have a jury to convict somebody

2    because jurors, you know, it's difficult.  But I think in

3    this case, ladies and gentlemen, because of all the

4    sympathy and the passion and the emotion that you have

5    heard in this case it's more difficult for you to acquit.

6    But you took an oath that you would follow the Judge's

7    instructions.  And you took an oath that if, in fact, the

8    prosecution has not proved to you beyond a reasonable

9    doubt that my client committed these offenses, you told

10   Judge White that you would find him not guilty.

11          And you go back to the jury room and you return

12   verdicts.  You do not have to justify your verdict to

13   anybody.  Nobody.  You just have to justify it to

14   yourself.

15          And I ask you to go back to the jury room, listen

16   to your fellow jurors, listen to what everybody has to

17   say, but at the same time if you have reasonable doubts in

18   your mind I ask you not to compromise.  Because you,

19   yourself, have to be happy, and you, yourself, have to be

20   settled with the verdict that you return because you can't

21   change your verdict tomorrow.  And you have to feel in

22   your own heart that it's the right decision that you make.

23          Ladies and gentlemen, I told you that the

24   evidence in this case would not only show that they would

000570

1    not be able to prove beyond a reasonable doubt that he

2    committed these offenses but you would see that the

3    witnesses are not believable, they're not credible.  It's

4    not something that you can feel comfortable with returning

5    guilty verdicts on charges especially such as murder,

6    armed robbery and residential burglary.

7         I told you, ladies and gentlemen, that if, in

8    fact, you promise to keep an open mind I would promise to

9    you that I would prove to you how it is that they have not

10   proved beyond a reasonable doubt that Mr. Bland is guilty

11   of these offenses.  I believe I have done that so now it's

12   up to you.  It's up to you to do your job no matter how

13   difficult it may be.  It's up to you to go back to the

14   jury room and return verdicts of not guilty.

15        Thank you.

16   THE COURT:  Okay.  Ms. Boggs.

17   MS. BOGGS:  Thank you, your Honor.  Defense counsel.

18   MR. LENARD:  Ms. Boggs.

19   MS. BOGGS:  Ladies and gentlemen of the jury:  As I

20   told you in opening statement, ladies and gentlemen, it is

21   for you to determine what happened here.  If I say

22   something or Mr. Lenard says something that is not the

23   truth, please disregard that, okay.  You are to determine,

24   the 12 of you, when you go back to the jury room to decide

000571

1   this case what the evidence in fact was in, what you heard

2   and what you saw in this courtroom.

3        Ladies and gentlemen, I found something very

4   interesting as I sat and listened to some of the things

5   Mr. Lenard said occurred here, and I felt like we sat in

6   two different trials.  Sometimes, folks, and, as I say,

7   everyone hears things a little differently.  And I don't

8   remember hearing things the way Mr. Lenard does, and we're

9   going to talk about that quite a bit.

10       Mr. Lenard says there's a lot of things the State

11  doesn't have.  Let's talk about the things he says we

12  don't have.  He talked about hair.  He talked about

13  fingerprints.  He talked about DNA.  He talked about

14  eyewitness.  And in opening statement he talked about you

15  don't have Christopher Scott and you don't have Ian

16  Lockhart.  Let's take a real long look at what he is

17  talking about here.

18       Remember how he asked Officer Vicidomini --

19  that's a tough one for me -- about hairs?  Why didn't you,

20  like pick up all the blankets?  Why didn't you do this or

21  do that?  He says, well, we have a technique we use.  It's

22  a light technique that shows there wasn't really anything

23  there.

24       And then I talked to Officer Vicidomini about

62

**000572**

1    hairs.  When are hairs of any real value?  If you get the

2    root, okay.  Hairs that break off are a different story.

3         So he says, well, why didn't they, like check

4    everything and try to get all this stuff to try and find

5    hairs?  Well, let's talk about that.  Because, first of

6    all, meet Ian Lockhart. (Holding up exhibit)  He's bald.

7         Look at the defendant.  Not much hair there.

8         MR. LENARD:  Judge, I object because I don't know if

9    there has been evidence shown that Ian Lockhart was bald

10   on the 30th, 31st, if he shaved his head.

11        THE COURT:  Overruled.  The jury has heard the

12   evidence.

13        MS. BOGGS:  Ladies and gentlemen, if you recall, when

14   I talked to Kory I asked him, did the defendant look like

15   this when you met him?

16        Yes.

17        I then asked him about Christopher Scott, meeting

18   Christopher Scott.  And I asked him the same thing about

19   Christopher Scott.  He said, well, the day he was at the

20   house on August 30th his hair was shorter but other that

21   that this is Christopher Scott.

22        So, ladies and gentlemen, we're going to hunt

23   around and we're going to look on the hopes that maybe

24   we'll find a hair?  And what did Vicidomini tell you about

000573

1    hair?  If it's a broken hair all you might be able to know

2    is the race of a person.  Well, the Blands are all negro

3    and so are the suspects.  So what would we, maybe, have

4    gotten out of that hair?  Gee, someone negro is in the

5    house.  And maybe -- well, let's say we got really, really

6    lucky and maybe got somehow a plucked hair where there was

7    DNA and we found out that it came back to Keith Bland,

8    Christopher Scott or Ian Lockhart.  What would the defense

9    tell you?  That they were there the day before.  We all

10   know that.  So what value does hair have?  None.

11        Fingerprints.  He talked to you about

12   fingerprints and so did Officer Vicidomini.  What he

13   indicated, ladies and gentlemen, that they found no

14   identifiable fingerprints.  And that is a big difference

15   between no prints.  No identifiables.

16        He talked about surfaces like back doors.  He

17   talked about surfaces that might be dusty or surfaces that

18   have been wiped off.  And the problem again, folks, is

19   what if we had found a fingerprint?  What would the

20   defense argue?  They were there the day before.

21        And, ladies and gentlemen, let's think about what

22   our killers would have had to have touched in that house

23   on that day.  The back door.  Don't really get prints off

24   of the back door because of the dirty texture of it, et

000574

1   cetera.  They would have had to slide their hands under

2   the pillows.  What is wrong with that?  First of all,

3   cloth is almost impossible to get fingerprints off of, he

4   testified, and then it would have to be you set your

5   prints down.  When you are sliding to get a gun under a

6   pillow, you are not going, oh, let me make perfect prints.

7   Come on, folks.  Common sense.

8         The Judge is going to tell you that you should

9   consider all of the evidence in this case in the light of

10   your own observations and experiences in life.  Common

11   sense.

12         Fingerprints.  And again, ladies and gentlemen,

13   we'll talk about the glasses and things like that because

14   what came out of it was there were no identifiable prints.

15   Identifiable prints.

16         Then counsel wanted to talk about DNA.  And he

17   said, ladies and gentlemen, that I told you in opening

18   statements there is only an issue of three glasses here,

19   but I think I clearly told you we were talking about four

20   items, four particular items.  And four items that were

21   set out on a counter, okay.  We got two on the lower

22   level, one on the upper, and we have the bottle of Arizona

23   Tea up near the refrigerator.  Four items.

24         Now, you did learn from DNA that whatever DNA was

000575

1    there was identified.  So it's not like there is some

2    unknown DNA.  Remember how I kept asking, did you get

3    Patrick Scott's this and Patrick Scott's that?  Everything

4    that they had was identified.

5         And let's talk about those four items.  Now, you

6    did learn that there was -- excuse me -- DNA on two of the

7    items.  Let's start with the one of the tall glasses.

8    They found that there was no DNA here, nothing they could

9    identify, okay.  They found a mixture of DNA on one of the

10    other glasses and the single DNA of the victim on another.

11         Now, I don't know how it is in your household,

12    but when I was growing up we always had the glass by the

13    kitchen sink.  My mother would tell us in the morning

14    don't dirty a million glasses.  So during the day

15    everybody in the family would keep like a glass near the

16    kitchen sink.  Sometimes my dad might grab mine by mistake

17    or I might grab his.  Could that be a way there is a

18    combined DNA of Kory and mom?  Maybe when mom sat down

19    with her three guests she grabbed her glasses by the sink,

20    one that her and Kory's DNA could have been on.  Maybe

21    there is a situation where she accidentally grabbed

22    another one because maybe she grabbed the glass of another

23    family member as they were talking and visiting, another

24    family member like the defendant, who got their DNA.  I

000576

1  believe the ruling was inconclusive for saliva on this

2  one.  Inconclusive, but maybe there was some evidence of

3  saliva but not enough to find DNA.  So we're still talking

4  about three items here, folks.

5       And I would submit to you, think about why there

6  isn't DNA for these three people.  Well, when you're

7  nervous you get a real dry mouth.

8       MR. LENARD:  Judge, I'm going to object to that.  Is

9  she a doctor, physiologist or something?  Where did we

10  hear about dry mouth and secretions of your mouth and

11  things like that?  This is beyond the scope of the

12  evidence that I heard.  She is giving expert opinion now.

13       THE COURT:  It's argument.  Overruled.

14       MS. BOGGS:  Does it take an expert to know if you're

15  nervous maybe you have a dry mouth?  Could be they're

16  nervous about what they're about to do.  That could be an

17  explanation about why there is no saliva.  But it's your

18  common sense, folks.  Think about it.  The point is there

19  is an absence of saliva for any of the suspects on the

20  glasses but yet there are things out.  There are things

21  out that weren't there before.

22       Counsel wants to talk about how we don't have an

23  eyewitness.  Well, ladies and gentlemen, I tell you that

24  we have an earwitness.  And that ties in that we do, in

000577

1    fact, have Chris and Ian Scott (sic) in this courtroom

2    over the last week.  We have them through the ears of

3    Patrick Scott.

4        MR. LENARD:  Judge, I object to that.

5        THE COURT:  Overruled.

6        MS. BOGGS:  Let's talk about Patrick Scott.  Mr.

7    Lenard says that Patrick Scott beat him up and it hurt.

8    Well, folks, I say --

9        MR. LENARD:  Objection.  I didn't say it hurt.  I said

10   he beat me up.

11       THE COURT:  Overruled.

12       MS. BOGGS:  Folks, the truth hurts.  He brought up an

13   isolated statement -- and, ladies and gentlemen, again

14   this goes back to why I contend that you have to consider

15   the evidence yourselves.

16       Remember when he said that when they were first

17   talking, the first conversation, about a week before the

18   murder when they are talking about the guns, he said that

19   Patrick Scott made the following statement:  That on that

20   date they were talking about where they could get them but

21   they didn't say where or when or how.  Well, remember,

22   what they did say on that date?  We're gonna go, we're

23   gonna get some guns.  Guns and money.

24       And here is where the other thing is wrong, I

000578

1       Q     How long does it normally take you to get to

2   work?

3       A     Thirty, thirty-five minutes.

4       Q     Now, Mr. Bland, I am going to turn your attention

5   to the weapons that you had in your house on that day.

6   When you left for work that day, what weapons were there

7   in your house?

8       A     Beretta .12 gauge, Beretta .9 millimeter, a .38

9   Taurus, a .25 Beretta.

10      Q     And if you could for the jury, if you could run

11  through each of those and tell or explain to the jury

12  where it was located?

13      A     Beretta .12 gauge was located in the rear of the

14  bedroom, the master bedroom closet, to the left tucked in

15  the corner.

16      Q     Was that -- could you see that from the closet

17  door?

18      A     No.

19      Q     Okay.  Where were the rest of the weapons?

20      A     And the .9 millimeter -- the .9 millimeter was

21  located underneath my dresser, the .38 was underneath the

22  pillow, the .25 of my bed.  The .38 was underneath the

23  pillow of my bed, and the .25 was underneath the pillow of

24  the bed.

000198

1    entitled Stipulation.  Now come the People of the State of

2    Illinois by Jeff Tomczak through his assistant, Janine

3    Boggs, and the defendant by and through his attorney,

4    George Lenard, and hereby enter into the proposed

5    stipulation:

6            (1) That People's Exhibit Number 32, a fired

7    projectile which was found in the living room near the

8    victim, was sent to the Illinois State Police Crime Lab to

9    determine the calilber of the bullet.

10            (2) That Kris Rastrelli of the Illinois State

11   Police Crime Lab examined the bullet and determined it to

12   be a .38 caliber bullet.

13           And it has today's date signed by both Mr. Lenard

14   for the defendant and Ms. Boggs for the People.

15           The next one is labeled People's Exhibit Number

16   51, entitled Stipulation.  Now comes the People of the

17   State of Illinois by Jeff Tomczak through his assistant,

18   Janine Boggs, and the defendant by and through his

19   attorney, George Lenard, and hereby enter into the

20   proposed stipulation:

21           (1) That Patrick Scott while a juvenile was

22   adjudicated a delinquent minor.

23           Dated today's date.  Signed by Ms. Boggs for the

24   State and Mr. Lenard for the defense.

000400

1    sufficient if the jury believes from the evidence beyond a

2    reasonable doubt the defendant, or one for whose conduct

3    he is legally responsible, combined to do an unlawful act

4    such as to commit an armed robbery or a residential

5    burglary and the deceased was killed by one of the parties

6    committing that act.  That's what accountability is about.

7         Keith doesn't have to pull the trigger.  Keith

8    Bland with Ian and Chris to go to this home first time to

9    check and see what everybody's schedules are to determine

10   when they go back, and they planned to go back and get

11   those guns.  Guns which, according to the father, they had

12   no authority to have.  And in the course of those crimes

13   Delores Bland is killed, shot in the back of the head

14   probably with her own gun.

15        Ladies and gentlemen, another thing that Mr.

16   Bland told you which I thought was real interesting, I

17   didn't have any reason to go and get a gun on that day

18   because I had one.  Remember?  But he told you also from

19   that stand that in January of the year 2000, some eight

20   months before the murder, the police had taken that gun

21   from him.  Did he have a gun that day?  Did he have money

22   that day?  Obviously not.  Because he was out at that

23   house to get those two things.

24        And what seals it up?  Victor McClendon.  I

                                                          92

1        A    Yes, he did.

2        MS. BOGGS:  I have nothing further.

3        THE COURT:  Anything?

4        MR. LENARD:  Nothing.

5        THE COURT:  Thank you.  You may step down.

6             (The witness was excused.)

7        MS. BOGGS:  If the State could have five minutes.

8        THE COURT:  Pardon?

9        MS. BOGGS:  Could we have five minutes?

10       THE COURT:  Yeah.

11            (After a short recess was taken the following

12             proceedings were had outside the presence of the

13             jury.)

14       THE COURT:  Are you ready?

15       MS. BOGGS:  Uh-huh.

16       THE COURT:  All right.

17       MS. BOGGS:  Your Honor, the only thing the State has

18  left is we ask leave to file the certified statement of

19  the conviction for the defendant for the record, not for

20  the jury at all.  Then the State has no further evidence.

21       THE COURT:  Okay.  Anything further on behalf of the

22  defense?

23       MR. LENARD:  Yes.

24       THE COURT:  Okay.

000505

1    Is Counsel now requesting that both tapes, one tape, no

2    tapes be played at this point?

3              THE COURT:  I don't know.

4              MS. BOGGS:  One more thing, Judge.  I know -- I

5    see the hour is getting late.  The State has another

6    witness that would be very short today.  And the reason I

7    say that is he has to appear in court in Cook County

8    tomorrow.  So it's imperative that I at least -- we may go

9    a little late today, but I intend to have him on the stand

10   no more than two minutes.  But he has to be in Cook County

11   tomorrow, so I cannot have him back here tomorrow.

12             THE COURT:  Cook County again outranks us, huh?

13             MS. BOGGS:  I think that they will not honor my

14   writ tomorrow.  But he will be very short for the State,

15   and I don't know what Defense --

16             MR. LENARD:  I don't know who that witness is.

17             MS. BOGGS:  It's Victor McClendon.

18             MR. LENARD:  Judge, I believe all I can ask is

19   that the first tape be played.

20             THE COURT:  You want to ask that the first tape

21   be played?

22             MR. LENARD:  Yes.

23             THE COURT:  Okay.  Drawing into issue the way

24   they conduct their interview; is that correct?

000843

1          MR. LENARD:  Yes.

2          THE COURT:  If you are asking to play it for the

3   contents of the tape, that's all I need to know.  Were you

4   asking to play it for the contents of the tape?

5          MR. LENARD:  No, I'm asking to play it for the

6   manner of the interview.

7          THE COURT:  How the interviews are conducted?

8          MR. LENARD:  Yes, and how the questions are

9   posed.

10          THE COURT:  I will allow it for that.  I will

11   also direct the jury that that is the purpose for which it

12   is being offered.

13          MS. BOGGS:  Then the State's position is that

14   you have to play the second tape.

15          THE COURT:  Well, it's his right now.  Okay.

16   Then we'll bring it back up.  Right now it's his.  I can't

17   force him to ask to play the second tape.  But he is

18   drawing into issue the way in which the officers conduct

19   their interview.

20          MS. BOGGS:  Okay.  But I guess the point is, if

21   we're going to play one, we feel that both have to be

22   played, because it draws that in issue.  Play 'em both at

23   the same time.

24          THE COURT:  Well I can't force him to play it.

000844

1   At first he said he was, now he says he's not.  I can't

2   force him to play both tapes.  He is drawing into issue

3   right now how the police conduct their interview on the

4   first interview.  That's where we are.

5          MR. LENARD:  If the State wants to play the

6   second tape, I have no objection to that, but I do not

7   believe that I can ask the Court to play the second tape

8   for contents alone, because I'm not making the allegation

9   that they were putting words in his mouth the second time.

10  So I can't ask the Court to play the second tape other than

11  to play it for the contents.

12         THE COURT:  That's fine.

13         MS. BOGGS:  We agree with that.  We're saying

14  the State's position, if you play one, you have to play the

15  second.  I'm just saying for procedural matters, we should

16  play one right after the other.

17         THE COURT:  Well one will be at the request of

18  the Defense, one will be at your request.  When you make

19  that, we'll deal with it.  Then I will admonish them.

20         MS. BOGGS:  I'm making it now so procedurally we

21  can do it in the most reasonable fashion.

22         THE COURT:  We'll do it one at a time.

23         MS. BOGGS:  All right.

24         MR. LENARD:  If I can get this ready first.

1    address that before the jury comes in to make it run

2    smoother, or do you want me to wait until that witness

3    comes in?

4         THE COURT:  How many witnesses more do you have?

5         MR. LENARD:  Judge, I have one, two, three, and

6    possibly four.

7         THE COURT:  Okay.  They're all here?

8         MR. LENARD:  Yes.

9         THE COURT:  Okay.  So we move smoothly at least

10   through the first three, what's your objection?

11        MS. BOGGS:  Well, regarding Katherine Harris, your

12   Honor, the People received a four-page statement allegedly

13   from Ms. Harris.  Well, I wouldn't say allegedly.  I

14   assume it's from her.  But the majority of that statement

15   is that she is trying to allege there was some kind of

16   conspiracy by some detective.  She makes a statement that

17   they were trying to provide her with money to give a

18   statement concerning Keith.  The problem is there is no

19   specificity as to who this detective was, whether he is

20   associated with the Will County Sheriff's Department.

21   There has been no detective put on the stand to be

22   confronted with this statement, and there is really no

23   reliability in terms of identification or who the possible

24   detective might be.

000442

1          So we would ask for a motion in limine to bar any

2      questioning of some conspiracy if he is trying to allege

3      there is one from the Will County Sheriff's Department

4      because there has been no foundation for that and no

5      confrontation of anyone concerning it.  And again from her

6      lack of any names or identification, I think there is some

7      serious problems with that.

8          MR. LENARD:  Judge, she is going to testify that

9      Sergeant Bradley --

10         THE COURT:  What is her relationship to all of this,

11     to the case?

12         MR. LENARD:  She is a friend of Keith's wife.

13         THE COURT:  She is a friend of who?

14         MR. LENARD:  Sicill Bland.

15         THE COURT:  Okay.

16         MR. LENARD:  They were looking for -- the day after

17     the shooting they were looking for Keith.  They went to

18     Sicill Bland's house where Keith also stays.  They were

19     looking for Keith.  Katherine Harris was there.  She was

20     there with her baby.  Bradley talked to her.  Just walked

21     into the house, started looking around.  Asked her if she

22     knew where Keith was.  We're looking for a gun.  Asking

23     her does he have a gun?

24         And then at some point in time Bradley and her,

1    because I guess there was two detectives, one went

2    downstairs.  Bradley stayed up there, and Bradley said to

3    her we really want Keith.  We know that you are on Public

4    Aid and offered her some money to take care of her kid or

5    something or other if she cooperated.

6        THE COURT:  Okay.  What does that have to do with

7    impeaching who?

8        MR. LENARD:  There is no impeachment.  What that shows

9    is that shows you have got a witness, a police officer

10   investigator, who is investigating Keith Bland, who is

11   attempting to pay off witnesses to give information.

12       THE COURT:  Okay.  And --

13       MR. LENARD:  And I think that the jury has a --

14       THE COURT:  As a paid informant?

15       MR. LENARD:  Not a paid informant.

16       THE COURT:  A gift?

17       MR. LENARD:  No.  A bribe.

18       THE COURT:  A bribe for?

19       MR. LENARD:  Giving the information, trying to find

20   him.

21       THE COURT:  Okay.

22       MR. LENARD:  I guess to try to find him.  I don't

23   know.  I don't know about --

24       THE COURT:  What does that have to do with any of the

1    throw, you know, you know, something in there to cloud up

2    the water if there is nothing there for the reason to put

3    it in.

4        MR. LENARD:  Okay.  First of all, if, in fact,

5    Detective Bradley is the only black police officer on the

6    Will -- or detective on the Will County Sheriff's

7    Department, then he is also the shortest, first of all.

8        Second of all, the --

9        THE COURT:  I think shortest as far as the detectives

10   that were there.  Somebody certainly wouldn't put the

11   shortest detective on if they don't know the Will County

12   Sheriff's Department.

13       MR. LENARD:  Well, she is saying he is the tallest

14   black detective.  He is also the shortest.

15       THE COURT:  Even saying all that is true, what is

16   there?  You give me some reason, some legitimate reason,

17   under all the evidence in the case that has come out here

18   that where this now becomes an issue.

19       MR. LENARD:  He says -- he says to her we really want

20   Keith Bland.

21       THE COURT:  Okay.

22       MR. LENARD:  We'll give you money and we'll take care

23   of your daughter.

24       THE COURT:  I am not going to allow it, okay.  Not

000447

1  under the current state of the evidence as it's presented

2  today.

3      MR. LENARD:  Okay.  I thought I have got a chance to

4  present my case, too, and that's what I am trying to do is

5  present it in my case.

6      THE COURT:  I understand.

7      MR. LENARD:  Okay.

8      THE COURT:  They have made an objection to that on the

9  basis of the evidence that is there.  And on that basis I

10  have ruled that under the scenario and under the evidence

11  as it currently exists in this case, as it stands right

12  now, that is an irrelevant question at this particular

13  time.

14      MR. LENARD:  I can call witnesses other than for the

15  purpose of impeachment in my case?

16      THE COURT:  Sure.

17      MR. LENARD:  Okay.

18      THE COURT:  They just made an objection to that

19  witness based upon what they understood it to come forward

20  for.  I believe they call it a motion in limine.

21      MS. BOGGS:  Correct.

22      THE COURT:  All right.  Now we ready?

23      MR. LENARD:  Ready.

24      THE COURT:  Okay.  Bring them in.

000448

1        A       Me and my daughter.

2        Q       How old is your daughter?

3        A       She was two months at the time, two or

4    three months at the time.

5        Q       And what, if anything, did the

6    investigators or deputies say to you when they arrived

7    at your residence?

8        A       Nothing.  When they first arrived I was in

9    the hallway getting -- me and my baby just came home.

10   They walked right passed me.  They asked me --

11       Q       Who -- if I can interrupt -- who is it that

12   asked you?

13       A       Officer Bradley asked me did Keith Bland

14   live there.  I told him no, but his wife does.  He

15   asked me do I know where Keith Bland live.  I told him

16   no, I do not.  He asked me do I think he might have --

17   do I think he have a gun.  I told him no, and if he

18   had not in our house.  Then they searched through

19   everything.  They went through pictures.  They went

20   through his wife's stuff, the mother's stuff, the

21   brother's stuff.  They just went through everything.

22       Q       Did you -- did they ask you for permission

23   to search your residence before?

24       A       No, because they walked right passed me.

1        Q        What, if anything, else happened?

2        A        After they got through searching

3    everything, Officer Bradley -- I talked to Officer

4    Bradley.  He told me that he know I'm on Public Aid,

5    and if I could help him get Keith he would give me

6    money because he wants Keith real bad.

7        Q        He said what?

8        A        He told me that he know I'm on Public Aid,

9    and if I could help him get Keith he would give me

10   money because he wants Keith real bad, on his way out

11   the door.

12       Q        That was who that said that?

13       A        Officer Bradley.

14       Q        That's all I have.

15                CROSS EXAMINATION

16                BY

17                MS. BOGGS

18       Q        So it's your testimony if you had

19   information concerning Mr. Bland he might provide you

20   with some assistance?

21       A        Yes.

22       Q        Do you know a person by the name of Lee

23   Lockhart?

24       A        Yes.

# STATE OF ILLINOIS



3-02-0942

People v. Keith Bland

## APPELLATE COURT          THIRD DISTRICT

### OTTAWA

At a term of the Appellate Court, begun and held at Ottawa, on the 1st Day of January in the year of our Lord Two thousand four, within and for the Third District of Illinois:

Present –

HONORABLE WILLIAM E. HOLDRIDGE, Presiding Justice

HONORABLE KENT SLATER, Justice                              X

HONORABLE DANIEL L. SCHMIDT, Justice                       X

HONORABLE TOBIAS G. BARRY, Justice

HONORABLE TOM M. LYTTON, Justice

HONORABLE MARY W. McDADE, Justice

HONORABLE MARY K. O'BRIEN, Justice                         X

GIST FLESHMAN, Clerk

BE IT REMEMBERED, that afterwards on

___July 23, 2004___ the  Order of the Court was filed in the Clerk's Office of said Court, in the words and figures following viz:



JUL 2 4 2004

Office of the State Appellate Defender
THIRD DISTRICT
OTTAWA, ILLINOIS

NOTICE

The text of this opinion may be changed or corrected prior to the time for filing of a Petition for Rehearing or the disposition of the same.

No. 3--02--0942

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

A.D., 2004

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 01--CF--86 |
| KEITH BLAND, | ) ) | Honorable Stephen White, |
| Defendant-Appellant. | ) | Judge, Presiding. |

ORDER    "Not To Be Published"

Following a jury trial, the defendant, Keith Bland, was convicted of armed robbery (720 ILCS 5/18--2 (West 2000)) and first degree murder (720 ILCS 5/9--1(a)(1) (West 2000)). The trial court sentenced him to consecutive terms of 28 years' imprisonment for armed robbery and 43 years' imprisonment for murder. On appeal, the defendant claims that: (1) a witness's testimony that a codefendant had confessed was improper; (2) prosecutorial misconduct deprived him of a fair trial; (3) evidence that he refused to answer questions concerning an alibi witness resulted in an unfair trial; (4) the trial court abused its discretion in barring the testimony of a witness; and (5) his sentence was excessive and an abuse of the court's discretion. We affirm.

FACTS

At trial, it was established that the defendant's stepmother, Dolores Bland, died on August 31, 2000, due to a single gunshot fired at contact range to the back of her head. Officers who investigated the home found no signs of forced entry. A projectile was recovered near the body which was later determined to be a .38 caliber bullet.

Three drinking glasses were found in the kitchen. The glasses were examined for the presence of saliva. The defendant and his codefendants, Ian Lockhart and Christopher Scott, were excluded as sources for the recovered deoxyribonucleic acid (DNA). The DNA on one of the glasses matched the victim. A .9-millimeter automatic handgun was found underneath a dresser in the master bedroom. No other weapons were recovered. Cash in the amount of $420 was found in another bedroom. Several hundred spent shell casings for various weapons were found in the back yard.

Kory Bland, Dolores's son and the defendant's half-brother, testified that the defendant, Lockhart, and Scott visited the Bland home the day before Dolores's death. The defendant asked about Kory's schedule and his parents' schedule.

Kenneth Gordan, Dolores's son, lived with Dolores and Keith Bland, Sr. He testified that the defendant, Lockhart and Scott were at the Bland home the day before the victim's death. The defendant asked when Dolores, Keith, Sr., and Kory would be home.

2

The next day, Kenneth left for work around 2:30 p.m.   When he left, Dolores was washing dishes.   He had about $500 under his mattress at the time.

Keith, Sr., testified that on the day Dolores was killed, he worked from 3 p.m. to 11 p.m.   At that time, there were several weapons in his home, including a Beretta .12 gauge, a Beretta .9 millimeter and a Taurus .28 millimeter.   According to Keith, Sr., the defendant had been living with his family.   In 1999, he asked the defendant to leave because he was being disrespectful to Dolores.

Detective Mike Guilfoyle testified that he interviewed the defendant the day after the shooting.   The defendant told Guilfoyle that he had visited his family the day before Dolores' death because he wanted them to know he had been discharged from the Navy.   The defendant said he spent the night of August 30, 2000, at Christopher Scott's apartment.   The next morning, he went to Oakwood to visit his wife.   Around 2:30 in the afternoon, he and Christopher went to the park and played basketball until dusk.

Guilfoyle testified that he spoke with the defendant again on September 7, 2000.   When he asked the defendant whom he was with on August 31, 2000, the defendant became angry and said he could not remember.   He stuck his fingers in his ears and said "blah-blah."

Guilfoyle also interviewed Christopher's brother, Patrick Scott.   He spoke with Patrick on two occasions, and both

3

interviews were videotaped. Guilfoyle denied answering questions for Patrick during the interview. He explained that he had to interpret Patrick's answers in the form of a question because Patrick used street slang.

Patrick Scott testified that he was staying with his brother, Christopher, in late August 2000. Lockhart also lived in the apartment, and the defendant sometimes spent the night there.

Over the defendant's objection, Patrick testified that he overheard the defendant, Christopher and Lockhart discussing problems the defendant was having with a person named "Hot Sauce" because the defendant had stolen drugs from him. Someone suggested stealing some guns to get some money. The defendant said they could get guns from his father's house. The defendant said they should go to his father's house and talk to the defendant's brother to learn a good time to take the guns. The day before Dolores's death, the defendant mentioned that he had gone to the house with Christopher and Lockhart to find out when no one would be home. Lockhart said if anything happened they would kill them. The defendant said, "That ain't--cool, I ain't tripping." According to Patrick, the defendant's response meant that he did not care.

A few days later, it was mentioned that they had gotten the guns. In a joking manner, someone said that Christopher was "crazy as hell." Christopher responded that he "had to pop her ass." The defendant, Christopher and Lockhart also discussed an

4

alibi. Lockhart was supposed to have been with his wife, and the
defendant and Christopher were going to say that they had been
playing basketball.

Patrick admitted that he left for Colorado shortly after the
shooting. He had to be arrested in Colorado and brought back to
Illinois to testify. He spoke to police on two separate
occasions. Both interviews were videotaped. Patrick denied that
the officers were putting words in his mouth. He stated that in
the first interview he just "half stepped" which meant that he
did not tell the officers everything that he knew. He just told
them what he wanted to tell them.

Defense counsel then asked Patrick if he knew that the three
men had been arrested and charged based on his "half step"
statement. Patrick responded, "No, I didn't know that. I
thought that they was (sic) arrested because of Chris's
confession." Later, defense counsel asked Patrick why he
voluntarily talked to the officers a second time. Patrick stated
that he went back because he had heard that his brother had
already confessed, and he was not going to let the defendant and
Lockhart get off. The defendant then moved for a mistrial
because Patrick mentioned that Christopher had confessed. The
trial court denied the motion.

The defendant moved to play Patrick's videotaped statements
to demonstrate the manner in which the interviews were conducted.
The request was allowed. During the interviews, Patrick's

5

responses were difficult to understand. The officers' questions
were lengthy, and Patrick often answered "yes" or "no."

Victor McClendon had recently been convicted of a Class X
felony. He testified that in early September 2000, he saw
Lockhart and the defendant on the street. They tried to sell him
some automatic weapons and a shotgun. McClendon stated that he
had no agreement with the prosecution and that he did not expect
to receive leniency in his own case for his testimony against the
defendant.

Prior to the defendant's presentation of witnesses, the
State moved to bar the testimony of Kathryn Harris. In an offer
of proof, defense counsel indicated that Harris was a friend of
the defendant's wife. He stated that she would testify that the
day after the shooting, two officers offered her financial
assistance if she agreed to tell them the location of the
defendant and any guns. The court allowed the State's motion and
barred her testimony.

The defendant testified that he was 21 years old. He stated
that he, Lockhart, and Christopher were at his parents' home the
day before the shooting. He denied asking anyone about their
schedules. The defendant denied that he was at his parents'
house on the day of the murder. He further denied having a
conversation with Christopher and Lockhart about stealing guns
from his parents' home. On August 31, 2000, the defendant was in
Chicago at his wife's house. In the afternoon, he then went out
on the streets and sold drugs until about 9 p.m. He admitted

6

that he sold drugs all the time and that he had smoked "weed" on the day his stepmother was shot.

The defendant denied telling Detective Guilfoyle that he was with Christopher in the park playing basketball on August 31, 2000. He also denied making a similar statement to investigator Fred Hunter. The defendant stated that he stuck his fingers in his ears when he was being interviewed because the officers were yelling at him and accusing him of killing his mother. The defendant admitted that he had been arrested for possessing a gun in January of 2000.

In rebuttal, Guilfoyle denied that anyone yelled at the defendant during the interviews. Fred Hunter testified that the defendant told him that he was playing basketball with Christopher on the day Dolores was shot. The court also admitted a certified statement of conviction for unlawful use of a weapon dated January 19, 2001. The statement indicated that the defendant had apparently been arrested for the charge on January 4, 2001. The statement was not shown to the jury.

The jury found the defendant guilty. Posttrial motions were filed by defense counsel and by the defendant pro se. Following a hearing, the request for a new trial was denied. The defendant was sentenced to consecutive terms totaling 71 years in prison.

ANALYSIS

On appeal, the defendant first argues that he was denied a fair trial based on Patrick's testimony that his brother, a nontestifying codefendant, had confessed.

7

Use of a nontestifying codefendant's inculpatory statement violates a defendant's right to confront and cross-examine witnesses against him.  <u>Bruton v. United States</u>, 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620 (1968).  However, testimony that does not reveal the substance of a nontestifying codefendant's statement may be presented to demonstrate the course of an investigation or for other reasons, even if the jury could infer that the nontestifying codefendant implicated the defendant.  <u>People v. Bounds</u>, 171 Ill. 2d 1, 662 N.E.2d 1168 (1995).  No <u>Bruton</u> violation occurs where the prosecutor does not refer to the confession in argument and the only reference to the statement is revealed by the defendant himself.  <u>People v. Reeves</u>, 314 Ill. App. 3d 482, 732 N.E.2d 21 (2000).

Here, Patrick's testimony did not include the substance of his brother's statement.  He did not testify that Christopher had implicated the defendant in his statement to police.  He merely stated that Christopher had confessed.  More importantly, the prosecutor did not argue in her closing argument that Christopher had confessed or that in his confession he named the defendant.  The only reference to the confession was elicited not by the prosecution but by defense counsel's own cross-examination.  We therefore find no <u>Bruton</u> violation.

### B.   Motion in <u>Limine</u>

Next, the defendant challenges the trial court's decision to grant the State's motion in <u>limine</u> and bar the testimony of

8

Kathryn Harris.  He claims that the testimony was relevant to his theory that he was framed for the victim's murder.

A motion in <u>limine</u> should be used with caution so as not to deprive a defendant of a legally viable defense.   <u>People v. Henderson</u>, 223 Ill. App. 3d 131, 583 N.E.2d 1187 (1991). However, such a motion may be employed to exclude collateral or extraneous matters.   <u>Henderson</u>, 223 Ill. App. 3d 131, 583 N.E.2d 1187.   Relevant evidence is evidence having a tendency to make the existence of any fact that is of consequence to the determination of the action more probable than it would be without the evidence.   <u>People v. Boclair</u>, 129 Ill. 2d 458, 544 N.E.2d 715 (1989).   Evidentiary rulings are within the sound discretion of the trial court and will not be disturbed on review unless the court abused its discretion.   <u>Boclair</u>, 129 Ill. 2d 458, 544 N.E.2d 715.

Here the proffered testimony that the officers offered Harris money in exchange for information as to the location of the defendant or any guns was irrelevant.   Harris' testimony was neither exculpatory, nor did it tend to prove the defendant's theory that he was framed by the investigators.   Even assuming her testimony to be true, the officer's request was an offer of money for information, not an attempt to influence false testimony.   In granting the State's motion in <u>limine</u>, the trial court noted that there was no indication that Harris was offered money to plant evidence or to testify falsely against the defendant.   The court found that the offered testimony was not

9

relevant to the issue presented.    We find no abuse of discretion
in the trial court's decision.

### C.    Prosecutorial Misconduct

The defendant claims several comments made by the prosecutor
during cross-examination of the defendant and during closing
argument deprived him of his right to a fair trial.

#### 1.    *Improper questioning*

Generally, cross-examination is limited to the scope of the
direct examination.    People v. Franklin, 135 Ill. 2d 78, 552
N.E.2d 743 (1990).    A trial court's decision as to what is within
the proper scope of cross-examination will not be reversed on
appeal absent a clear abuse of discretion which results in
manifest prejudice to the defendant.    Franklin, 135 Ill. 2d 78,
552 N.E.2d 743.

The defendant argues that the prosecutor had a duty to
correct the defendant's false testimony regarding the date of his
prior arrest.

During the trial defense counsel elicited testimony from the
defendant that he had been arrested for the unlawful possession
of a Smith and Wesson .38 in January 2000.    Later, the prosecutor
presented a certified statement of conviction showing that the
defendant had apparently been arrested on January 4, 2001.

The defendant correctly states that the prosecutor cannot
allow testimony which she knows to be false to go uncorrected.
See People v. Torres, 305 Ill. App. 3d 679, 712 N.E.2d 835
(1999).    In Torres, the court held that the State's knowing use

10

of perjured testimony to obtain a criminal conviction constituted
a violation of due process of law.   <u>Torres</u>, 305 Ill. App. 3d 679,
712 N.E.2d 835.

Here, it was the defendant himself who testified incorrectly
as to the date of his arrest.   The State did not produce a
perjured statement.   We can find no rule of law to support the
defendant's theory that the prosecution has a duty to correct the
defendant's direct examination testimony.

Moreover, we are unable to conclude that the prosecutor's
reference to the "January 2000" arrest in closing argument
resulted in the denial of a fair trial.   Given the defendant's
incorrect testimony, the jury could have inferred that defendant
did not possess the gun that was used to shoot the victim.   Had
the correct arrest date been noted, the jury might have inferred
that the defendant's gun was used in the shooting because he was
found in possession of an identical gun four months later.   Thus,
the defendant was not prejudiced by the State's failure to
correct the date.

Next, the defendant argues the prosecutor erred when she
cross-examined the defendant about the veracity of other
witnesses and when she commented on the discrepancies between his
testimony and the officers' testimony in closing argument.

During trial, Detective Guilfoyle and Fred Hunter testified
that the defendant had made several statements to them concerning
whom he was with on the day the victim was shot.   During cross-
examination, the prosecutor asked the defendant numerous times if

11

he made such statements. Each time the defendant denied making such statements. The prosecutor then stated, "So all of these people are lying?" Defense counsel's objection was overruled, and the defendant answered, "Yes."

Comments comparing the credibility of witnesses have been allowed in cases where the parties' version of events vary substantially. People v. Pecoraro, 144 Ill. 2d 1, 578 N.E.2d 942 (1991). In Pecoraro, the prosecutor stated that the jury would have to find two prosecution witnesses were not believable to return a verdict other than guilty. Pecoraro, 144 Ill. 2d 1, 578 N.E.2d 942. Our supreme court found that the defendant was not prejudiced by these comments because his version of the incident differed considerably from the version given by the prosecution's witnesses. Pecoraro, 144 Ill. 2d 1, 578 N.E.2d 942.

Likewise, the defendant's version of the events in this case differed considerably from the investigators' testimony. The prosecutor cross-examined the defendant as to the officers' veracity and commented on these discrepancies in her closing statement, but she did not argue that the jury would necessarily convict the defendant if it believed the officers. The prosecutor's questions and comments were permissible given the variation between the defendant's alibi testimony and the statements he gave to the investigators.

The defendant also claims that the prosecutor improperly elicited testimony of other crimes.

12

When defense counsel, on direct examination, asked the defendant where he was on the day the victim was shot, the defendant replied, "Selling drugs." Defense counsel continued to question the defendant:

"DEFENSE COUNSEL:   Okay. What kind of drugs?

DEFENDANT:   Cocaine, rock cocaine.

       * * *

DEFENSE COUNSEL:   How long were you selling drugs?

DEFENDANT:   How long?

DEFENSE COUNSEL:   Yes.

DEFENDANT:   I sell drugs all the time, all for the day I was selling drugs."

On cross-examination, the prosecutor stated, "you want to tell us you are a drug dealer and that you are convicted of carrying guns and all those kinds of things but you are not a murderer, right?" The defendant responded, "No."

Based on the defendant's testimony on direct examination, we find no error in the prosecutor's inquiry on cross-examination. The question was within the scope of defense counsel's direct examination. Given the defendant's own admissions during the trial, the question did not unduly prejudice the defendant.

### 2. Closing argument

The prosecutor has wide latitude in making closing arguments. People v. Turner, 128 Ill. 2d 540, 539 N.E.2d 1196 (1989). On review, the prosecutor's arguments must be examined in their entirety and the complained-of comments placed in

13

context.  People v. Morgan, 142 Ill. 2d 410, 568 N.E.2d 755
(1991).  Improper remarks will not merit reversal unless they
result in substantial prejudice to the defendant, considering the
context of the remarks, their relationship to the evidence, and
their effect on the defendant's rights to a fair and impartial
trial.  People v. Easley, 148 Ill. 2d 281, 592 N.E.2d 1036
(1992).

The defendant first complains of the prosecutor's comments
regarding the lack of DNA evidence on certain objects that were
recovered from the victim's house.  He claims that her comments
were a misstatement of the evidence.

A forensic expert testified that several items were analyzed
for DNA.  She stated that items were recovered and tested for the
presence of saliva and that from that saliva a DNA analysis was
conducted.  She testified that saliva was found on some articles
but not on others.  The prosecutor commented during closing
argument that saliva was not found on three glasses because the
defendant and codefendants probably had dry mouths and were
nervous.

It is highly improper for the prosecutor to argue
assumptions or facts not based upon evidence in the case or to
present to the jury what amounts to his own testimony.  People v.
Smith, 141 Ill. 2d 40, 565 N.E.2d 900 (1990).  However, a
prosecutor's statements based on the facts in evidence or upon
reasonable inferences from the evidence are within the scope of

14

proper closing argument.    People v. Myers, 246 Ill. App. 3d 542, 616 N.E.2d 633 (1993).

The fact that the defendant's dry mouth would explain why his DNA was not recovered from the scene of the crime was not based upon any evidence in the case.   The prosecutor overstepped the bounds of fairness and violated her ethical obligation as a lawyer by introducing her own testimony.   However, after reviewing all of the evidence in support of the defendant's guilt, the closing arguments in their entirety and the jury instructions, we conclude that the prosecutor's remarks did not so prejudice the jury as to deny the defendant a fair trial or have a significant impact on the jury's finding of guilt. Accordingly, the remarks, standing alone, do not constitute reversible error.

Finally, the defendant insists that the prosecutor misstated the evidence in her rebuttal argument.

Patrick Scott testified that he could not recall whether he had told police that he knew where Kenneth Bland kept his money inside the Bland home.   Detective Guilfoyle earlier testified that Patrick told him he knew where Kenneth kept his money.   In closing, defense counsel stated that Patrick denied knowing where Kenneth kept his money.   In rebuttal, the prosecutor noted Patrick's testimony and stated that there was a difference between a witness not recalling that he made a statement and denying that he did so.

15

In rebuttal, the prosecutor is permitted to respond to comments made by defense counsel which clearly invite a response. People v. Kliner, 185 Ill. 2d 81, 705 N.E.2d 850 (1998). Having carefully examined the closing arguments, we find no error in the complained-of comment. The prosecutor's comment was invited by the defendant's argument. The prosecutor merely provided the jury with a more detailed analysis of Patrick's statements. Consequently, the defendant was not denied a fair trial based on the prosecutor's rebuttal comment.

Based on the foregoing analysis, we also reject defendant's contention that the cumulative impact of prosecutorial misconduct during closing arguments deprived her of a fair trial. Having concluded that the saliva comment, while improper, did not have a significant impact on the jury's finding of guilt and that the other comments were not improper, we do not find that defendant was prejudiced by the sum of the alleged errors. See People v. Speight, 153 Ill. 2d 365, 606 N.E.2d 1174 (1992).

          D.   Defendant's Alibi Statements to Guilfoyle

The defendant argues that he was denied a fair trial by Guilfoyle's testimony that the defendant refused to supply details about an alibi witness he had previously provided. He claims that Guilfoyle's statement that the defendant put his fingers in his ears and said "blah-blah" violated his fifth amendment right to remain silent (U.S. Const., amend. V).

Detective Guilfoyle testified that on the day after the shooting he interviewed several family members regarding where

16

they were the evening Dolores died.  The defendant, after being advised of his <u>Miranda</u> rights, provided details of his whereabouts and whom he was with from the evening of August 30 through August 31.  During their next interview, the defendant answered several more questions.  Guilfoyle then asked whom he was with the day Dolores was shot.  Guilfoyle said that the defendant became angry, stuck his fingers in his ears, and refused to answer any questions.  The defendant did not object to the prosecutor's question or the answer Guilfoyle gave, and the State proceeded with its case in chief.

The due process clause of the fourteenth amendment prohibits impeachment on the basis of a defendant's silence following <u>Miranda</u> warnings.  U.S. Const., amends. V, XIV.  Consequently, it is fundamentally unfair to allow the defendant's prior refusal to speak to be used against him at trial as an admission or for purposes of impeachment.  See <u>Doyle v. Ohio</u>, 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240 (1976) (State may not cross-examine defendant for failing to offer facts during his police interview that are introduced for the first time at trial); <u>Jenkins v. Anderson</u>, 447 U.S. 231, 65 L. Ed. 2d 86, 100 S. Ct. 2124 (1980).  However, when a defendant chooses to speak to the police after he has been advised of his <u>Miranda</u> rights, he may subsequently be impeached at trial regarding incompleteness or inconsistencies in his prior exculpatory statements.  <u>People v. Little</u>, 223 Ill. App. 3d 264, 585 N.E.2d 148 (1991).

17

Contrary to the defendant's allegation, Detective
Guilfoyle's testimony during the prosecution's case in chief did
not include any comment on the defendant's exercise of his right
to remain silent.  The prosecution's open-ended examination
inadvertently elicited Guilfoyle's one brief statement that the
defendant stopped answering his questions.  The defendant did not
object to Guilfoyle's response at that time it was given, and the
prosecutor did not comment upon that particular fact during her
closing statement.  In sum, we do not believe that the defendant
was denied a fair trial by an improper focus upon the invocation
of his rights.  No error occurred, and even if we were to
conclude that it did, such error was harmless beyond a reasonable
doubt in view of the evidence presented here.  See _People v._
_Beller_, 74 Ill. 2d 514, 386 N.E.2d 857 (1979).

### E.  Excessive Sentence

Last, the defendant argues that the sentence imposed by the
trial court is excessive and should be reduced.  The defendant
contends that the trial court improperly minimized factors in
mitigation, such as his youth, his relatively minor criminal
history and his marital status.  We disagree.

The trial court is charged with the task of fashioning a
sentence which strikes an appropriate balance between the
protection of society and the rehabilitation of the defendant.
_People v. Cox_, 82 Ill. 2d 268, 412 N.E.2d 541 (1980).  On review,
the court's determination will not be disturbed absent an abuse
of discretion.  _People v. Perruquet_, 68 Ill. 2d 149, 368 N.E.2d

18

882 (1977). A sentence that falls within statutory guidelines
should not be reduced unless it is manifestly disproportionate to
the nature of the offense. <u>People v. Nussbaum</u>, 251 Ill. App. 3d
779, 623 N.E.2d 755 (1993).

In this case, the defendant faced a prison term of 20 to 60
years for first degree murder (730 ILCS 5/5--8--1(a)(1)(a) (West
2000)) and 6 to 30 years for armed robbery (730 ILCS 5/5--8--
1(a)(3) (West 2000)). Sentences imposed for both offenses, if
committed as a single course of conduct, must be served
consecutively. 730 ILCS 5/5--8--4(a)(i) (West 2000). The record
shows that the court acknowledged mitigating circumstances and
found them greatly outweighed by the aggravating factors. The
defendant and two codefendants stole guns from the defendant's
family home and shot his stepmother at point blank range. The
trial court was not obligated to give the defendant's
rehabilitative potential more weight than the extreme seriousness
of the instant offense. We conclude that the upper-range
sentence, while harsh, was not manifestly disproportionate to the
offense. Accordingly, we hold that the court did not abuse its
sentencing discretion.

### III. CONCLUSION

The judgment of the circuit court of Will County is
affirmed.

Affirmed.

SLATER, J., with O'BRIEN and SCHMIDT, JJ., concurring.

19

```
STATE OF ILLINOIS,    )
APPELLATE COURT,      )    ss.
THIRD DISTRICT        )
```

        As Clerk of the Appellate Court, in and for said Third District of the State of Illinois, and keeper of the Records and Seal thereof, I do hereby certify that the foregoing is a true, full and complete copy of the opinion of the said Appellate Court in the above-entitled cause, now of record in this office.

        In Testimony Whereof, I hereunto set my hand and affix the seal of said Appellate Court at Ottawa, this 23rd day of July in the year of our Lord two thousand four.

        Clerk of the Appellate Court

**STATE OF ILLINOIS**



3-05-0089 & 3-05-0178
People v. Keith Bland

**APPELLATE COURT**      **THIRD DISTRICT**
**OTTAWA**

At a term of the Appellate Court, begun and held at
Ottawa, on the 1st Day of January in the year of our Lord
Two thousand six, within and for the Third District of
Illinois:
Present –

        HONORABLE DANIEL L. SCHMIDT, Presiding Justice    X

        HONORABLE TOM M. LYTTON, Justice    X

        HONORABLE MARY W. McDADE, Justice

        HONORABLE MARY K. O'BRIEN, Justice    X

        HONORABLE WILLIAM E. HOLDRIDGE, Justice

        HONORABLE ROBERT L. CARTER, Justice

        HONORABLE VICKI R. WRIGHT, Justice

          GIST FLESHMAN, Clerk

          BE IT REMEMBERED, that afterwards on

  December 8, 2006     the  Order of the Court was filed
in the Clerk's Office of said Court, in the words and figures
following viz:

ie te ... en may be changed
corrected p... to the time for filing of a
etition for Rehearing or the disposition
the same.

No. 3--05--0089
(Consolidated with No. 3--05--0178)

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

A.D., 2006

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit Will County, Illinois |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 01--CF--86 |
| KEITH BLAND, | ) ) | Honorable Stephen D. White |
| Defendant-Appellant. | ) | Judge Presiding. |

ORDER

Petitioner, Keith Bland, was convicted of first degree murder (720 ILCS 5/9--1(a)(2) (West 1998)) and armed robbery (720 ILCS 5/18--2(a) (West 1998)). He filed a petition for post-conviction relief, which the trial court dismissed. On appeal, he argues that his petition should not have been dismissed without an evidentiary hearing. We affirm.

BACKGROUND

At petitioner's trial, it was established that petitioner's stepmother, Dolores Bland, died on August 31, 2000, from a single gunshot from a .38 caliber weapon. Petitioner testified that he was arrested for unlawful use of a .38 caliber weapon in January 2000. The prosecutor later presented a certified statement showing that petitioner was arrested for unlawful use of a weapon in

January 2001.   The statement was not shown to the jury. During

closing argument, the prosecutor referred to petitioner's arrest as

occurring in January 2000.

Petitioner was found guilty of the robbery and murder of

Bland.   He was sentenced to 71 years imprisonment.   Petitioner

appealed his convictions, arguing that (1) the trial court

improperly allowed and barred certain testimony, (2) he was denied

a fair trial because of prosecutorial misconduct and the improper

admission of evidence, and (3) his sentence was excessive.   People

v. Bland, 3-02-0942 (2004).   In his appeal, petitioner argued that

the prosecutor committed misconduct by failing to correct

petitioner's testimony regarding the date of his arrest for

unlawful use of a weapon.   In deciding that issue, we concluded:

"Given the defendant's incorrect testimony, the jury

could have inferred that defendant did not possess the

gun that was used to shoot the victim.   Had the correct

arrest date been noted, the jury might have inferred that

the defendant's gun was used in the shooting because he

was found in possession of an identical gun four months

later.   Thus, the defendant was not prejudiced by the

State's failure to correct the date."

We found petitioner's remaining arguments on appeal to be without

merit and affirmed his convictions.

On December 6, 2004, petitioner filed a petition for post-

conviction relief alleging, in part, that (1) his trial counsel was

ineffective for not objecting when the sheriff required him to wear

2

a stun belt throughout his trial, (2) he was denied a fair trial because he was required to wear the stun belt, and (3) his appellate counsel was ineffective for failing to raise the stun belt issue on appeal. In his petition, he alleged that wearing the stun belt could have caused him to make a mistake while testifying.

Attached to the petition were several affidavits from petitioner. According to one of the affidavits, petitioner informed his trial counsel that he did not want to wear the stun belt. Petitioner's trial counsel allegedly told petitioner that it was standard procedure and that nothing could be done about it. In another affidavit, petitioner stated that he told his appellate counsel about the stun belt issue and was told that he would have to pursue that issue in post-conviction proceedings. In a letter, attached to the petition, appellate counsel advised petitioner:

> "I cannot supplement the record with the stun-belt issue, since there is nothing in the record indicating its use.
>
> You will have to pursue this issue in a post-conviction petition but you should wait until the appeal is over."

On January 11, 2005, the trial court dismissed the petition as frivolous and patently without merit. On that same day, petitioner filed an affidavit, dated December 30, 2004, which stated in pertinent part:

> "During trial I wore a white dress shirt and tie.

3

> The stun-belt that I was forced to wear was very big and
> it buldged [sic] out under my shirt.  While sitting at
> the Defense table, I had to sit leaned forward at all
> times because the stunbelt prevented me from sitting back
> on the back of the chair.  I was afraid if I put pressure
> on the stun-box by sitting back on it, I will electrocute
> myself.  While testifying, I had to sit forward in my
> chair so I wouldn't lean on the stunbox.  The stunbelt
> was on my mind during my testimony.  I was embarrassed,
> afraid and I knew the jury could see the enormous bulge
> under my shirt. * * * "

According to the affidavit, petitioner was not able to completely concentrate on his testimony and, therefore, made a "crucial mistake" in his testimony.  The affidavit was attached to a letter from petitioner stating that it was an amendment to his post-conviction petition.

The trial court treated petitioner's affidavit as a second post-conviction petition and reviewed it in conjunction with the issues raised in petitioner's first post-conviction petition.  The trial court dismissed the second petition, finding it to be frivolous and patently without merit.

### ANALYSIS

The Post-Conviction Hearing Act (Act) provides defendants with a means of challenging their convictions or sentences for constitutional violations.  725 ILCS 5/122--1 et seq. (West 2004).

4

The Act establishes a three-stage process for adjudicating post-conviction petitions.   725 ILCS 5/122--1 through 122--8 (West 2004); People v. Williams, 364 Ill. App. 3d 1017, 1022, 848 N.E.2d 254, 258 (2006).  At the first stage, the court determines whether the petition alleges a constitutional violation that necessitates relief under the Act.   Williams, 364 Ill. App. 3d at 1022, 848 N.E.2d at 258.  The trial court should dismiss a petition at the first stage if it is "frivolous or is patently without merit."  725 ILCS 5/122--2.1(a)(2) (West 2004).   A post-conviction petition is frivolous or patently without merit if the allegations in the petition, taken as true, fail to present the      "gist of a constitutional claim."  People v. Edwards, 197 Ill. 2d 239, 244, 757 N.E.2d 442, 445 (2001).

If the petition survives the first stage, the defendant moves on to the second stage under the Act, at which point an indigent defendant is appointed counsel.  People v. Ramirez, 361 Ill. App. 3d 450, 452, 837 N.E.2d 111, 115 (2005); 725 ILCS 5/122--4 (West 2004).  At the second stage, the defendant's counsel may file an amended post-conviction petition, and the State may file a motion to dismiss or an answer to the petition.  Ramirez, 361 Ill. App. 3d at 452, 837 N.E.2d at 115.  If the trial court does not dismiss or deny the petition, the proceeding advances to the third and final stage, at which the trial court conducts an evidentiary hearing on the petition.  Ramirez, 361 Ill. App. 3d at 452, 837 N.E.2d at 115; 725 ILCS 5/122--6 (West 2004).

A petition filed under the Act must "clearly set forth the respects in which the petitioner's constitutional rights were violated." 725 ILCS 5/122--2 (West 2004). The petitioner should attach to the petition affidavits, records or other evidence supporting the allegations contained therein. 725 ILCS 5/122--2 (West 2004). We review de novo a trial court's dismissal of a post-conviction petition. Williams, 364 Ill. App. 3d at 1023, 848 N.E.2d at 258.

I. Amended or successive post-conviction petition

The State contends that we should not consider the claims contained in the affidavit petitioner filed on January 11, 2005, because that affidavit constitutes a successive post-conviction petition that does not satisfy the "cause and prejudice test." Petitioner responds that the affidavit was not a successive petition but was an amendment to his original post-conviction petition.

The Act contemplates the filing of only one post-conviction petition. People v. Purnell, 356 Ill. App. 3d 524, 529, 825 N.E.2d 1234, 1239 (2005). Issues raised in a successive post-conviction petition will not be considered unless they satisfy the "cause and prejudice test." Purnell, 356 Ill. App. 3d at 529, 825 N.E.2d at 1239. "Cause" is an objective factor external to the defense that impeded defense counsel's attempts to raise the claim in an earlier proceeding. People v. Leason , 352 Ill. App. 3d 450, 453, 816 N.E.2d 747, 751 (2006). "Prejudice" is an error so infectious to the

6

trial that the resulting conviction violates due process.  <u>Leason</u>,
352 Ill. App. 3d at 453, 816 N.E.2d at 751.

Here, petitioner filed a post-conviction petition accompanied
by many exhibits, including several affidavits.  Approximately
three weeks later, petitioner drafted another affidavit in support
of his petition.  Petitioner filed that affidavit with the court
approximately five weeks after filing his original petition.  On
that same day, the trial court dismissed petitioner's post-
conviction petition before receiving and reviewing petitioner's
affidavit.

There is no question that petitioner's affidavit was written
before the trial court dismissed his post-conviction petition and
was meant to amend that petition.  The affidavit should not be
treated as a successive petition that must satisfy the "cause and
prejudice test."  Thus, we will review the claims contained in
petitioner's original petition, supporting documents, and the
subsequent affidavit.

II.  Ineffective assistance of trial counsel and unfair trial
claims

Petitioner claims that his trial counsel was ineffective for
failing to object to him wearing a stun belt throughout his trial.
He argues that his wearing of the stun belt resulted in an unfair
trial.

A petitioner's claim of ineffective assistance of counsel is
resolved by applying the standard set forth in  <u>Strickland v.
Washington</u>, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed.2d 674 (1984).

7

Makiel, 358 Ill. App. 3d at 105, 830 N.E.2d at 737. A petitioner must demonstrate both a deficiency in counsel's performance and prejudice resulting from the deficiency. Makiel, 358 Ill. App. 3d at 105, 830 N.E.2d at 737.

To demonstrate deficient performance, a petitioner must establish that counsel's performance was below an objective standard of reasonableness. Makiel, 358 Ill. App. 3d at 105, 830 N.E.2d at 737. Prejudice is demonstrated if there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. Makiel, 358 Ill. App. 3d at 105-06, 830 N.E.2d at 737.

When a defendant objects to wearing a stun belt, the trial court must consider certain factors to determine if the defendant should be restrained. See People v. Boose, 66 Ill. 2d 261, 362 N.E.2d 303 (1977). If the trial court determines that a stun belt is necessary, the trial court must state for the record the reasons for allowing the defendant to be restrained and give the defendant's attorney an opportunity to present reasons why the defendant should not be restrained. People v. Martinez, 347 Ill. App. 3d 1001, 808 N.E.2d 1089 (2004). If a defendant's counsel does not object to the use of restraints, the issue is waived. See People v. Allen, No. 99977, ___ Ill. 2d ___, ___ N.E.2d ___, 2006 WL 1512248 (June 2, 2006); People v. Curtis, ___ Ill. App. 3d ___, 854 N.E.2d 269 (2006).

At the time of petitioner's trial, it was standard operating procedure of the Will County sheriff's department to require all

8

in-custody felony defendants to wear stun belts.  See <u>Curtis</u>, ___ Ill. App. 3d ____, 854 N.E.2d 269; <u>Martinez</u>, 347 Ill. App. 3d 1001, 808 N.E.2d 1089.  According to petitioner, his counsel was aware of this policy and thought it would be useless to object to petitioner having to wear the stun belt, thus, waiving the issue on appeal.

### A. Deficient Performance

If the allegations in the petition are true, we believe that counsel's failure to preserve this issue for appeal was objectively unreasonable.  Despite Will County's standard operating procedure, petitioner's counsel should have objected to the stun belt if petitioner told him he was nervous about wearing it.  If counsel had objected, the trial court would likely have overruled the objection and required defendant to continue wearing the stun belt.  Nevertheless, the objection would have preserved the issue for review.

### B. Prejudice

We must now determine if defense counsel's failure to object prejudiced defendant and denied him a fair trial.    The use of obvious restraints at trial has the potential to prejudice a jury and result in an unfair trial.  See <u>People v. DuPree</u>, 353 Ill. App. 3d 1037, 820 N.E.2d 560 (2004); <u>People v. Young</u>, 341 Ill. App.3d 379, 792 N.E.2d 468 (2003).  Requiring a defendant to wear a stun belt amounts to an unfair trial only where the evidence presented is closely balanced, or the defendant's presumption of innocence, ability to assist counsel or dignity of the proceedings is compromised.  See <u>People v. Allen</u>, slip op. at 10, ___ Ill. 2d ___,

9

___ N.E.2d ___.

Petitioner claims that his wearing of the stun belt prejudiced the jury against him because the jury could allegedly see the stun belt he was forced to wear.   Petitioner stated in his affidavit that he "knew the jury could see the enormous bulge under [his] shirt." Assuming that the jury could see the bulge, it would not have known that the bulge was a stun belt.   Thus, no prejudice could have occurred. See <u>Stewart</u>, 161 Ill. App. 3d 99, 514 N.E.2d 51.

Petitioner also claims that his wearing of the stun belt affected his ability to assist in his own defense because it caused him to make a mistake while testifying.   However, we found on direct appeal that petitioner's mistake about the date of his prior arrest did not prejudice him.   See   <u>People v. Bland</u>, 3-02-0942 (2004).   Thus, whatever the reason for petitioner's erroneous testimony, it was not prejudicial.   Therefore, the trial court properly dismissed defendant's ineffective assistance of trial counsel and unfair trial claims.

III.   Ineffective assistance of appellate counsel claim

Finally, defendant claims on appeal that his appellate counsel was ineffective for failing to raise the stun belt issue on direct appeal.

Allegations of ineffective assistance of appellate counsel are evaluated under the same standard that governs the performance of trial counsel. <u>People v. Jones</u>, 219 Ill. 2d 1, 23, 845 N.E.2d 598, 610 (2006).   In order to prevail on his claim, petitioner must show

10

that counsel's failure to raise the issue on appeal was objectively unreasonable and that his decision prejudiced him. <u>Jones</u>, 219 Ill. 2d at 23, 845 N.E.2d at 610. Appellate counsel is not required to brief every conceivable issue on appeal and may refrain from developing nonmeritorious issues. <u>Jones</u>, 219 Ill. 2d at 23, 845 N.E.2d at 610.

When the record on appeal is insufficient to establish a fact, that fact cannot be raised on direct appeal. <u>People v. Newbolds</u>, 364 Ill. App. 3d 672, 847 N.E.2d 614 (2006). Where the disposition of a claim requires consideration of matters not contained in the record, it is more appropriate that the claim be addressed in a proceeding for post-conviction relief. See <u>People v. Ligon</u>, 365 Ill. App. 3d 109, 847 N.E.2d 763 (2006).

Here, petitioner's appellate counsel consciously chose not to raise the stun belt issue on appeal because there was no evidence in the record that petitioner had been forced to wear a stun belt during his trial. Since the appellate record did not establish that petitioner wore a stun belt, appellate counsel's decision not to raise the issue on appeal was objectively reasonable. See <u>Ligon</u>, 365 Ill. App. 3d 109, 847 N.E.2d 763; <u>Newbolds</u>, 364 Ill. App. 3d 672, 847 N.E.2d 614. Because petitioner cannot establish that his appellate counsel was ineffective, the trial court properly dismissed this claim.

                              CONCLUSION

The judgment of the circuit court of Will County is affirmed.

Affirmed.

                                  11

LYTTON, J., with SCHMIDT, PJ., and O'BRIEN, J., concurring.

```
STATE OF ILLINOIS,    )
APPELLATE COURT,      )    ss.
THIRD DISTRICT        )
```

    As Clerk of the Appellate Court, in and for
said Third District of the State of Illinois, and keeper of the
Records and Seal thereof, I do hereby certify that the foregoing
is a true, full and complete copy of the opinion of the said
Appellate Court in the above-entitled cause, now of record in
this office.

    In Testimony Whereof, I hereunto set my hand
    and affix the seal of said Appellate Court at
    Ottawa, this 8th day of December in the
    year of our Lord two thousand six.

       _____

       Clerk of the Appellate Court