UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. KEITH BLAND, | ) ) ) | |
| Petitioner, | ) ) ) | No. 08 C 2602 |
| v. | ) ) | Judge John W. Darrah |
| TERRY McCANN, Warden, Stateville Correctional Center, | ) ) ) ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION AND ORDER

In 2002, Petitioner, Keith Bland, was convicted of murder and armed robbery in the Circuit Court of Will County and was sentenced to a total of seventy-one years' imprisonment. Before the Court is Petitioner's petition for writ of *habeas corpus*.

## BACKGROUND

On August 31, 2000, Dolores Bland ("Dolores")[1], Petitioner's stepmother, was killed in her home by a single gunshot, fired at close range, into the back of her head. Petitioner and two other men, Ian Lockhart ("Lockhart") and Christopher Scott ("Christopher") were charged with the murder. At trial, the government argued that Petitioner and his two accomplices had gone to Dolores's house to steal guns owned by Petitioner's father, Keith Bland, Sr. ("Keith, Sr."), who lived with Dolores, and had killed Dolores when they found her home.

At Petitioner's trial, the government introduced the testimony of Patrick Scott ("Patrick"), Christopher's brother. Patrick testified that in late August 2000, he had been

---

[1] Because several individuals relevant to this petition have last names in common, the Court will use first names where necessary.

living with his brother Christopher. Lockhart also lived in the apartment, and Petitioner would sometimes spend the night. Patrick testified that he had overheard Petitioner, Lockhart and Christopher discussing problems Petitioner was having after stealing drugs from a person called "Hot Sauce." Someone suggested stealing guns to get some money. Petitioner said that they could get guns from his father's house and suggested that they talk to Petitioner's brother to find out when a good time to take the guns would be.

Patrick testified that the day before Dolores was killed, Petitioner mentioned that he had gone to the house with Christopher and Lockhart to find out when no one would be home. Lockhart said that "if anything happened they would kill them." Petitioner replied, "That ain't — cool, I ain't tripping." According to Patrick, Petitioner's response meant that he did not care. A few days later, Patrick heard someone mention that they had gotten the guns. Someone joked that Christopher was "crazy as hell." Christopher responded that he "had to pop her ass." Petitioner, Christopher and Lockhart also discussed alibis: Lockhart was supposed to have been with his wife; Petitioner and Christopher were supposed to have been playing basketball.

Several members of Petitioner's family also testified at his trial. Kory Bland ("Kory"), Dolores's son and Petitioner's half-brother, testified that Petitioner, Lockhart and Christopher visited the Bland home the day before Dolores's death and asked about the schedules of Kory and his parents. Kenneth Gordon ("Gordon"), Dolores's son, who lived at the Bland home, also testified that Petitioner, Lockhart and Christopher had

visited the Bland home that day and that Petitioner had asked when Dolores, Keith Sr. and Kory would be home. Keith Sr. testified that at the time of Dolores's murder, he had several guns in his home.

Detective Mike Guilfoyle testified that he interviewed Petitioner the day after Dolores was killed. Petitioner told Guilfoyle that he had gone to the Bland house the day before Dolores was killed to tell his family that he had been discharged from the Navy. Petitioner told Guilfoyle that he spent that night at Christopher's house and went to visit his wife in Oakwood the next morning. Then he and Christopher went to the park to play basketball from about 2:30 p.m. until dusk. Guilfoyle testified that he spoke with Petitioner again on September 7, 2000. During that conversation, Petitioner became angry when Guilfoyle asked whom he was with on August 31, 2000. Guilfoyle testified that Petitioner said he could not remember, stuck his fingers in his ears and said "blah-blah."

Petitioner took the stand at his own trial. He admitted that he, Lockhart and Christopher had gone to the Bland home the day before Dolores was killed, but denied having asked anyone about their schedules. Petitioner denied that he was at the Bland home the day of the murder and denied having a conversation about Lockhart and Christopher about stealing guns from Keith Sr. Petitioner claimed he was at his wife's house in Chicago on the morning of August 31, 2000. Petitioner testified that he was out on the street selling drugs the rest of the day. Petitioner denied telling Guilfoyle that he was playing basketball with Christopher. Petitioner claimed that he stuck his fingers in his ears during the interview with Guilfoyle because the officers were yelling at him and accusing him of killing his stepmother.

3

Petitioner was convicted of murder and armed robbery. Petitioner appealed his conviction to the Illinois Appellate Court, which affirmed the conviction and sentence on July 30, 2004. Petitioner filed a petition for leave to appeal ("PLA") in the Illinois Supreme Court, which was denied on November 24, 2004.

On December 2, 2004, Petitioner filed a postconviction petition in the state trial court. The state trial court dismissed that petition on January 11, 2005. On December 6, 2008, the appellate court affirmed, dismissing the postconviction petition. The state appellate court also denied petitioner's motion to supplement his briefs to raise additional issues. The Illinois Supreme Court denied Petitioner's PLA on May 31, 2007.

On July 17, 2007, Petitioner filed a motion for leave to file a successive post-conviction petition. The trial court denied that motion on July 18, 2007. The appellate court affirmed on July 24, 2008. The Illinois Supreme Court denied Petitioner's PLA on November 26, 2008.

The instant petition for writ of *habeas corpus* was received by this Court on May 6, 2008. On June 3 2008, the Court dismissed the petition with leave to reinstate because Petitioner was then appealing the state trial court's judgment denying him leave to file a successive postconviction petition. Petitioner filed a timely motion to reinstate his petition, which was granted on February 17, 2009.

## LEGAL STANDARD

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), an application for a writ of *habeas corpus* may not be granted unless adjudication of the claim in state court "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the

4

Supreme Court of the United States." *Jackson v. Frank*, 348 F.3d 658, 662 (7th Cir. 2003) (citing to 28 U.S.C. § 2254(d)(1)). A state-court decision is contrary to clearly established law if it applies a legal standard inconsistent with governing Supreme Court precedent or contradicts the Supreme Court treatment of a materially identical set of facts. *Bell v. Cone*, 535 U.S. 685, 694 (2002) (*Bell*); *Bynum v. Lemmon*, 560 F.3d 678, 684 (7th Cir. 2009). Similarly, a state court acts contrary to clearly established federal law if it applies a legal rule that contradicts prior Supreme Court holdings. *Ramdass v. Angelone*, 530 U.S. 156, 165-66 (2000).

The AEDPA modified a federal *habeas* court's role in reviewing state prisoner applications in order to prevent federal *habeas* "retrials" and to ensure that state-court convictions are given effect to the extent possible under law. *Bell*, 535 U.S. at 693. Consequently, the AEDPA calls for federal courts to presume the correctness of state courts' factual findings unless applicants rebut the presumption with "clear and convincing evidence." *Schiro v. Landrigan*, 550 U.S. 465, 473-74 (2007).

## ANALYSIS

Petitioner raises five grounds for relief: (i) the confession of a non-testifying codefendant was introduced against Petitioner, violating Petitioner's rights under the Sixth and Fourteenth Amendments; (ii) the prosecution violated his due process rights to a fair trial by eliciting testimony that Petitioner exercised his right to terminate questioning during an interview with police; (iii) Petitioner was denied a fair trial by the prosecutor's failure to correct an obvious misstatement in Petitioner's testimony and by

5

comments in closing arguments; (iv) the trial court violated Petitioner's right to present a defense by preventing Petitioner from calling a witness; and (v) the trial court violated Petitioner's due process rights by requiring Petitioner to wear a stun belt.

*Testimony of Christopher Scott's Confession*

Petitioner argues that his Sixth and Fourteenth Amendment rights were violated when Patrick mentioned during his testimony that his brother Christopher had confessed to the murder. During cross-examination by defense counsel, the following colloquy occurred:

> Q: So when you were talking to [the detectives] about these conversations that Keith and Ian and your brother allegedly were talking about and things that they said they did, you thought that was a joke too?
>
> A: No, I told them — I just half step. I didn't tell 'em everything.
>
> Q: You half step?
>
> A: Meaning that I told them what I wanted to tell them. I didn't tell them everything that I knew.
>
> Q: You understand that these individuals were arrested and charged with murder based on your half step, half things you didn't know?
>
> [The prosecutor]: Objection. That's not in evidence.
>
> The Court: Overruled. You can answer that.
>
> A: No, I didn't know that. I thought they was arrested because of Chris's confession.

(Tr. at 807.) Under further questioning by defense counsel, Patrick stated that he went back to talk to police because his brother had already confessed and he did not want

6

Petitioner and Lockhart "getting out." *Id.* at 823. Petitioner argues that the introduction of Patrick's testimony regarding Christopher's confession violated his right to confront Christopher.

The Illinois Appellate Court rejected Petitioner's claim. The Court cited *Bruton v. United States*, 391 U.S. 123 (1968) (*Bruton*), for the rule that "use of nontestifying codefendant's inculpatory statement violates a defendant's right to confront and cross-examine witnesses against him." *People v. Bland*, No. 01-CF-86, at 8 (Ill. App. Ct. 3d. dist. Jul. 26, 2004) (*Bland*). However, the court concluded that no violation had occurred because (i) Patrick's testimony did not reveal the substance of Christopher's statement, and (ii) the defense, not the prosecution, elicited the testimony and the prosecution did not make use of it in closing argument.

The appellate court's holding was not contrary to, nor an unreasonable application of, clearly established federal law. As the court concluded, there was no violation of *Bruton* because the substance of Christopher's statement was not revealed to the jury. *See United States ex rel. Klimawicze v. Sigler*, 559 F. Supp. 2d 906, 914-5 (N.D. Ill. 2008) *aff'd* 313 Fed. App'x 904 (7th Cir. 2009) (no *Bruton* violation where the substance of the codefendant's testimony was not introduced). Therefore, Petitioner is not entitled to *habeas* relief on this claim.

### *Violation of the Right to Remain Silent*

Petitioner next argues that the prosecution violated his due process rights to a fair trial by introducing Officer Guilfoyle's testimony that Petitioner plugged his ears during questioning and refused to speak to officers any further. Specifically, Petitioner argues

7

that he had the right to terminate questioning at any time and that the prosecution violated that right by informing the jury he had exercised it.

The appellate court stated that because "[t]he due process clause of the fourteenth amendment prohibits impeachment based on a defendant's silence following *Miranda* warnings . . . it is fundamentally unfair to allow the defendant's prior refusal to speak to be used against him at trial as an admission or for purposes of impeachment." *Bland*, at 17 (citing *Doyle v. Ohio*, 426 U.S. 610 (1976). However, the appellate court concluded that Petitioner had not been denied a fair trial because (i) the prosecution did not comment on Petitioner's exercise of his right to remain silent but, rather, inadvertently elicited that Petitioner stopped answering questions, and (ii) if any error occurred, it was harmless beyond a reasonable doubt.

Respondent first argues that the appellate court's conclusion that no violation of the right to remain silent occurred was correct because Petitioner did not invoke his right to remain silent. However, this reasoning was not considered by the appellate court. Rather, the court proceeded as if Petitioner had asserted his right to remain silent, thus implicitly finding that he had.

The Seventh Circuit has held that "even an equivocal indication of the desire to remain silent can suffice to invoke Miranda's requirement that interrogation cease." *Bobo v. Kolb*, 969 F.2d 391, 396 (7th Cir. 1992) (*Bobo*) (quoting *United States v. D'Antoni*, 856 F.2d 975, 980 (7th Cir.1988)). Respondent relies on *Bobo*, in which the Seventh Circuit held that a suspect who was simply "mute" upon his arrest had not invoked his right to remain silent. *Bobo*, 969 F.2d at 397. *Bobo*, however, is distinguishable from this case for several reasons. First, Petitioner's actions were more

8

indicative of an intent to cease all questioning than those of the suspect in *Bobo*. Plugging his ears and attempting to drown out any sound by saying "blah-blah-blah" was a clear attempt to block any further communication with police. In *Bobo*, the Seventh Circuit noted that the suspect's silence was consistent with a pause during which he decided whether to answer more questions. *Id*. The same cannot be said here. That Petitioner intended to end all questioning is even more apparent since he repeated the same behavior when two other officers took over the questioning from Officer Guilfoyle. Indeed, Guilfoyle's testimony that he terminated the interview because he could no longer have a conversation with Petitioner shows that police understood Petitioner intended to terminate all questioning.

Furthermore, *Bobo* is distinguishable in that there, the Seventh Circuit's finding that the suspect had not invoked his right to remain silent was in agreement with both the state trial court and appellate court, both of which had expressly found that the suspect had not invoked his right to remain silent. Here, the state-court record, if anything, demonstrates the opposite. Although the state appellate court did not explicitly find that Petitioner had asserted his right to remain silent, such a finding is implicit since the court proceeded to analyze the case as if Petitioner had invoked that right. For these reasons, Respondent's argument that Petitioner did not assert his right to remain silent is not persuasive.

The Court must also reject the appellate court's conclusion that the prosecution did not comment on Petitioner's exercise of his right to remain silent but rather "inadvertently elicited" that Petitioner stopped answering questions. *Bland*, at 18. To the contrary, the record shows that the prosecutor was seeking to elicit the testimony from

9

Officer Guilfoyle. The prosecutor asked whether Guilfoyle had asked Petitioner if he could provide any information as to whom he was with on August 31. When Guilfoyle responded in the affirmative, the prosecutor asked, "What was his reaction?" When Guilfoyle responded that Petitioner had become angry, the prosecutor asked, "What did he do?" (Tr. at 341.) This series of questions was clearly driving at Petitioner's refusal to answer the question by plugging his ears and drowning out the sound of the questions.

Finally, Respondent argues that even if the prosecution did violate Petitioner's right to remain silent, *habeas* relief should be denied because the violation did not have a "substantial and injurious effect or influence in determining the jury's verdict." *See Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993). The evidence against Petitioner was extensive. As noted above, Patrick's testimony regarding the overheard conversations between Petitioner, Lockhart and Christopher provided evidence the three men planned the crime and then talked about having committed it. Patrick's testimony was corroborated by the testimony of Gordon and Kory, both of whom testified that Petitioner had asked them about the schedules of family members. It was further corroborated by Officer Guilfoyle, whose testimony that Petitioner told him he had been playing basketball with Christopher was consistent with and supported the alibi Patrick said Petitioner would use.

Furthermore, three of the four weapons stored in the Bland home were missing after the murder. Keith Sr. testified that the only gun not missing, a .9 millimeter handgun, was usually kept under a pillow but that he had moved it under his dresser before the murder. Thus, the jury could conclude that whoever took the guns knew where to look for them, since only the gun that was not taken was the one that was not in

its usual place. The prosecution also introduced testimony of Victor McClendon, who testified that shortly after the murder, Petitioner and Lockhart offered to sell him weapons matching the description of those missing from the Bland house.

Given this evidence, the introduction of testimony that Petitioner refused to answer further questions by police could not be said to have had a substantial and injurious effect or influence in determining the jury's verdict.

*Prosecutorial Misconduct*

Petitioner next raises two instances of alleged misconduct by the prosecutor. Claims of prosecutorial misconduct are evaluated under the framework established in *Darden v. Wainwright*, 477 U.S. 168 (1986) (*Darden*). *Ruvalcaba v. Chandler*, 416 F.3d 555, 565 (7th Cir. 2005) (*Ruvalcaba*). Under *Darden*, the court first determines whether the comments were improper and determines if the comments, if improper, resulted in prejudice to the defendant. *Id.* The relevant question is whether the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process. *Darden*, 477 U.S. at 181 (internal quotations omitted). Under *Darden*, in evaluating whether the remarks resulted in prejudice, the court should consider "(1) whether the prosecutor misstated the evidence, (2) whether the remarks implicate specific rights of the accused, (3) whether the defense invited the response, (4) the trial court's instructions, (5) the weight of the evidence against the defendant, and (6) the defendant's opportunity to rebut." *Howard v. Gramley*, 225 F.3d 784, 793 (7th Cir. 2000).

11

Petitioner first argues that it was misconduct for the prosecutor to say that no DNA matching Petitioner or his codefendants had been found on three drinking glasses allegedly used by the three men in the Bland house because they must have been nervous and had dry mouths. The appellate court held that it was improper for the prosecutor to argue that Petitioner's dry mouth would explain why there was no DNA recovered. However, the court concluded that considering all the evidence, the closing argument and the jury instructions, "the prosecutor's remarks did not so prejudice the jury as to deny [Petitioner] a fair trial or have a significant impact on the jury's finding of guilt." *Bland*, at 15. The appellate court's holding that the statement was error but not prejudicial was neither contrary to, nor an unreasonable application of, *Darden*. As referenced by the appellate court, the jury was instructed to disregard arguments not based on the evidence. Furthermore, as noted above, there was overwhelming evidence of Petitioner's guilt presented to the jury.

Second, Petitioner argues that it was misconduct for the prosecutor to fail to correct Petitioner's misstatement that he had been arrested in January 2000 for unlawful possession of a .38 caliber handgun and that the gun had been taken from him upon the arrest. In fact, the arrest occurred in January 2001, after, rather than before, the murder. During closing arguments, the prosecution used the incorrect date to rebut Petitioner's arguments that he did not need to steal a gun because he already had one. The prosecutor argued that the gun had been taken from Petitioner in January 2000, eight months before the murder and, thus, Petitioner did have a reason to steal guns. Specifically, the prosecutor made the following comment:

12

> "Ladies and gentlemen, another thing that Mr. Bland told you which I thought was real interesting, I didn't have any reason to go and get a gun on that day because I had one. Remember? But he told you also from that stand that in January of the [sic] 2000, some eight months before the murder, the police had taken that gun from him. Did he have a gun that day? Did he have money that day? Obviously not. Because he was out at that house to get those two things."

(Tr. at 92.) The appellate court did not decide whether this was error by the prosecutor but did hold that Petitioner was not prejudiced by the use of the incorrect date. The appellate court reasoned that use of the correct date by the prosecutor might have been equally suggestive of Petitioner's guilt. The prosecutor's actual argument, based on the incorrect January 2000 arrest date, was that Petitioner needed to get a gun, thereby providing the motive for the robbery. The appellate court pointed out that had the prosecutor cited the correct date, January 2001, the jury might have inferred Petitioner's guilt based on his possession, four months after the murder, of a .38 caliber gun, the caliber gun used to kill Dolores.

Allegations that the prosecution knowingly relied on false testimony are reviewed under the standard set forth in *Napue v. Illinois*, 360 U.S. 264 (1959) (*Napue*). *Napue* held that "a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." *Id.* at 269. Furthermore, "[t]he same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Id.* "Under *Napue*, when the prosecutor knowingly relies on false testimony, the conviction must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Are*, 590 F.3d 499, 509 (7th Cir. 2009) (*Are*) (internal quotations omitted).

13

It might be argued that the prosecutor was merely commenting on Petitioner's testimony. Certainly, a prosecutor is within proper bounds when she repeats the testimony of a defendant, even when she believes it to be false, in order to show that it is inconsistent with itself or other evidence. However, something more than that took place here. Here, there was testimony, albeit by Petitioner, that Petitioner was arrested in January 2000. This factual assertion was false, and the prosecutor knew it to be false. Yet the prosecutor argued from the premise that it was true. She relied on the false statement that the arrest occurred in January 2000 to show that Petitioner did not have a gun on August 31, 2000 and, thus, needed to go get one. Thus, the prosecution knowingly made use of false testimony, in violation of *Napue*.

Therefore, the question becomes whether "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Are*, 590 F.3d at 509. The Court concludes that there is not. First, as noted above, there was overwhelming evidence of guilt presented in this case. Evidence that Petitioner needed a gun was only a small piece of the case brought against him. Second, as the appellate court noted, evidence that the arrest occurred on the correct date, in January 2001, would likely have been equally or more damaging to Petitioner. That Petitioner had a .38 caliber gun four months after the murder is arguably more suggestive of guilt than having had one confiscated eight months prior.

In conclusion, because the appellate court did not apply the rule set out in *Napue*, its holding was contrary to clearly established federal law. However, the Court finds that the second prong of the *Napue* standard is not met, i.e. there is no reasonable likelihood

14

that the false testimony could have affected the judgment of the jury. Therefore, *habeas* review is not warranted on this basis.

### *Exclusion of the Testimony of Kathryn Harris*

Petitioner next argues that the court improperly prevented him from calling Kathryn Harris as a witness. Petitioner argues that Harris, who lived with Petitioner's wife in Chicago at the time of the murder, would have testified that police came to her home the day after the murder and offered her money if she helped them "get" Petitioner. Petitioner argues that Harris's testimony would have bolstered his case that police framed him for the murder by coaching Patrick as to what to say to incriminate him.

The appellate court agreed with the trial court that the testimony was not relevant. Harris would have testified that the police offered her money in exchange for information as to the location of Petitioner or any guns. The court reasoned that even if Harris's story were truthful, the testimony would only show that police offered money for information, not that they were trying to influence Harris to provide false information.

A federal court reviewing a state court evidentiary decision under § 2254 must determine not whether the decision was wrong but whether it is "unreasonable to say" that the decision "did not violate [the petitioner's] due process right to present a defense." *Morgan v. Krenke*, 232 F.3d 562, 567 (7th Cir. 2000). Here, Petitioner has not shown a violation of his due process rights. Petitioner claims that Harris's testimony was relevant to show that police convinced Patrick to make up a false story implicating Petitioner. But Harris's testimony is only tangentially relevant to this point. Furthermore, Petitioner

was able to offer support for his theory regarding police coaching of Patrick, to the extent that support existed, by showing the video of Patrick's first interview with police and through the cross-examination of the interviewing officers.

Therefore, Petitioner is not entitled to *habeas* relief on this ground.

### Violation of Due Process Through Use of Stun Belt

Petitioner's fifth and final ground for *habeas* relief is that he was forced to wear a stun belt during the trial. Petitioner argues that the stun belt may have been visible to the jury and that, even if it was not, its presence interfered with his communication with counsel and affected his demeanor on the stand.

*Habeas* relief is not available on these grounds, however, because Petitioner has defaulted this claim. A federal *habeas* court may not "review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). Here, on postconviction review, the appellate court held that petitioner did not object to the stun belt's use, thereby waiving the issue on appeal. Under Illinois law, "[t]he failure to object to alleged error at trial and raise the issue in a posttrial motion ordinarily results in the forfeiture of the issue on appeal." *People v. Allen*, 222 Ill.2d 340, 355 (2006). Because the state appellate court relied on independent and adequate state-law grounds to reject Petitioner's claim, the claim is defaulted.

Barring a fundamental miscarriage of justice, which is not argued here, review of a defaulted claim is not permitted unless a petitioner "can establish both cause for the procedural error and prejudice resulting from that error." *Pisciotti v. Washington*, 143

F.3d 296, 300 (7th Cir. 1998). Petitioner attempts to satisfy the first prong of this test by alleging that counsel was ineffective for failing to object to the use of the stun belt. However, this ineffective-assistance-of-counsel claim could only excuse procedural default if it itself had been presented to the state courts. *See Edwards v. Carpenter*, 529 U.S. 446, 452 (2000). This, Petitioner did not do. Therefore, Petitioner's due process claim regarding the stun belt is defaulted, and the default may not be excused.

*Certificate of Appealability*

Under 28 U.S.C. § 2253, a certificate of appealability may issue only if the applicant has made a substantial showing of the denial of a constitutional right. For the reasons stated above, that standard has not been met. Therefore, the Court will not issue a certificate of appealability.

## CONCLUSION

For the foregoing reasons, the petition for writ of *habeas corpus* is denied; no certificate of appealability will be issued.

Dated: February 12, 2010

JOHN W. DARRAH
United States District Court Judge